STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JAMES COOK, DEFENDANT-APPELLANT.

Argued May 23, 1966—Decided June 27, 1966.

See also 43 *N. J.* 560, 206 *A.* 2d 359.

404

Mr. *Roger H. McGlynn* argued the cause for the appellant (*Messrs. McGlynn, Stein & Eberiel,* attorneys; Mr. *Roger H. McGlynn* on the brief).

Mr. *Barry H. Evenchick,* Assistant Prosecutor, argued the cause for the respondent (Mr. *Brendan T. Byrne,* Prosecutor of Essex County, attorney; Mr. *Barry H. Evenchick* and Mr. *Andrew F. Zazzali, Jr.,* Assistant Prosecutors, on the brief).

The opinion of the court was delivered by

PROCTOR, J. An Essex County Grand Jury returned two murder indictments against the defendant, James Cook, the first charging him with killing Betty Hammonds on April 22, 1964, and the other charging him with killing Charlotte Hammonds on the same date. On the State's motion and over the defendant's objection the indictments were consolidated for trial. A jury in the County Court found the defendant guilty of murder in the first degree on each indictment with a recommendation of life imprisonment. The trial judge sentenced the defendant to consecutive life terms in State Prison. Defendant appeals directly to this court as of right pursuant to *R. R.* 1:2–1(c).[1]

The State's theory was that Cook, after being rebuffed by Louise Hammonds, the mother of Betty Hammonds, age 10, and Charlotte Hammonds, age 8, went to the Hammonds apartment and slashed the throats of the two children.

Louise Hammonds testified that Cook was her boy friend from 1959 until about three weeks before the murders, when she decided to stop going with him. Cook's apartment at 2 Cottage Street in Newark was just around the corner from the Hammonds apartment at 284 Mulberry Street, and, despite the disagreement, Cook continued to be a frequent visitor at Louise's apartment.

---

[1] This matter was previously before this court on an interlocutory appeal in which we permitted the defendant to inspect the State's psychiatric reports. *State v. Cook,* 43 *N. J.* 560 (1965).

In the late afternoon of April 21, 1964, Cook arrived at the Hammonds apartment where Louise, her brother Eligh Hammonds, and several friends were talking, drinking and listening to records. By about 9:00 P. M. everybody except Eligh, who was apparently supposed to act as a baby sitter, and the two children, who had been put to bed in separate rooms, had left the apartment. The evidence further shows that Cook, Louise Hammonds and several friends spent the next few hours drinking and socializing in two nearby taverns, the Tic Toc and the Dreamland. While Louise was at the Tic Toc she was asked by one Junior Simpson to join him for a ride with several others. According to Louise's testimony Cook overheard this invitation and said: "You are not going anyplace. If you think you are smart you go." She replied, "You are not my father. If I want to go I will go." Cook then said, "Okay. You leave out of here and try to go anyplace." Louise sent for her brother, Eligh, who came to the Tic Toc and agreed that it was all right for her to go out with Junior Simpson. She decided to go and testified that just before she got into the car Cook threatened: "Okay, young lady. You go. But this will be one night you will always regret." Simpson, Louise and the others drove off sometime before midnight and she did not return to 284 Mulberry Street until about 3:00 A. M., almost an hour and a half after the bodies of her two children were discovered. After Louise's departure, Cook apparently remained at the Tic Toc for about a half hour and then was not seen by any of the witnesses until he was arrested shortly after the murders.

The argument between Louise Hammonds and Cook and his subsequent threat were overheard by Eligh Hammonds and several other witnesses, all of whom corroborated Louise's testimony.

Eligh Hammonds testified that after he went to the Tic Toc at the request of his sister he returned to the apartment and found the children asleep. He then went back to the Tic Toc where he met Deborah Colvin, John Willie Williams and

Marie Ann Streets. The testimony shows that at about 1:30 A. M. these four left the tavern and returned to 284 Mulberry Street. After entering the apartment Eligh found Charlotte Hammonds in bed with her throat cut. He ran to police headquarters, talked to the desk sergeant, and ran back to the apartment where he found the other child in the same condition.

The medical examiners found the deaths of the children were caused by a sharp cutting instrument which severed their jugular veins and carotid arteries. There was no evidence that either child was sexually molested. Both deaths were estimated to have occurred between 11:25 P. M. on April 21 and 1:25 A. M. on April 22.

Between 1:45 and 2:00 A. M. five members of the Newark Police Department arrived at the scene of the crimes. There they met Eligh Hammonds who identified himself as the uncle of the victims. The police asked Eligh if he knew who killed the children and he replied that James Cook was the only man mean enough to do something like that. He further told the police about the argument between Cook and Louise earlier in the evening and about Cook's threat.[2] Several of the police officers also knew that on at least two recent occasions Louise had complained to the police that she had been threatened by Cook, once with a baseball bat and once with a revolver.

After talking to Eligh all five officers immediately proceeded to 2 Cottage Street. The outer door to the building

---

[2] Officer McCann testified as follows:

"Q. What else, if anything did Eligh Hammonds say? A. He told me that this James Cook had had an argument and that he was in the apartment prior to the mother leaving the apartment.

*　　*　　*　　*　　*　　*　　*　　*

Q. Then they had had an argument? A. Yes, sir; it seems that the mother wanted to go out in a car with, I think, four other men. Mr. Hammonds [Eligh] told me that Mr. Cook said if she went out with these men she would be sorry, that he would do something to make her sorry for this.

Q. Did Hammonds [Eligh] say he had heard this? A. Yes, sir; he was there during the argument."

was locked. A tenant threw down a key and, after the police entered, directed them to Cook's apartment. They knocked, announced they were police officers, but received no response. The police testified that they then heard a scuffling inside and kicked in the door. Using flashlights they went through the darkened apartment to Cook's bedroom where they found him in bed. He was told that he was under arrest. Cook was covered by a blanket and was wearing shorts and an undershirt. His outer clothing was on a night table. One of the officers ordered Cook to get dressed and handed him his clothing. In doing so, he searched the trousers and found a black-handled folding knife in the back pocket. According to police testimony the knife blade was wet. They further testified that when Cook was asked to explain the wet knife he said that he had washed it after eating with it. It was established that Cook had borrowed this knife several months earlier from Constantine Jolas, who operated the Dreamland Tavern. Defendant admitted that he had possession of the knife and that he had borrowed it from Jolas.

Cook's hands were handcuffed behind his back and he was taken to the Hammonds apartment. While he was there one of the officers, Patrolman McCann, forcibly bent Cook over until his face was six inches from Betty Hammonds' body. Patrolman McCann testified as follows:

"Q. Did you interrogate him and take any admissions from him? Did he admit his guilt to you? A. No, sir; he showed no emotion whatsoever. I actually bent him over until his face was about six inches away from the victim. I said, 'did you do that?' He never uttered a word. He never said nothing, nor showed any emotion whatsoever."

Sometime after 3:00 A. M. Cook was driven to Newark Police Headquarters where he was taken to the detective squad room on the third floor. He was questioned by a police detective but denied any complicity in the murder of the two children. He was then fingerprinted and, according to the State's witnesses, placed in a cell between 4:00 and 5:00 A. M.

On the following morning, April 22, Cook was given a sandwich and coffee for breakfast. At 8:00 A. M. he was taken from his cell and questioned again for about one hour and a half, during which time he continued to maintain his innocence. Prior to this interrogation Cook was told that he did not have to answer any questions unless he spoke to a lawyer, but Cook said he didn't need a lawyer because he had nothing to hide. The police testified that at 9:30 he was returned to his cell while written statements were obtained from the witnesses. At 11:10 A. M. Cook was removed from his cell and taken to the interrogation room. This room measures 9′ x 14′. According to the State's witnesses he was questioned by three detectives. He was advised of his right to keep silent although he was not then told of his right to an attorney nor did he ask for one. At first he continued to assert his innocence, but after a half hour of questioning he admitted his guilt. He then agreed to accompany the police to the scene of the crimes and explain what had happened. At this time he was offered food but declined, asking instead for coffee and a cigar which were given to him. At about 1:45 P. M. Cook was taken to 284 Mulberry Street where the police said he detailed his commission of the killings including the return to his apartment at 2 Cottage Street.

Cook was returned to the interrogation room at about 2:15 P. M., where he began giving a written statement in the presence of a police lieutenant and two detectives. He was told by the lieutenant that he did not have to give a statement and that any statement he made could be used for or against him at any subsequent court proceeding.[3] Nobody then advised him of his right to an attorney nor did he ask for one. He was given food which he ate while answering questions.

---

[3] This advice was included in the written statement in the following form:

"Q. James do you know that any statement that you make now can be used for or against you in any future court action?
A. Yes."

Cook's statement was taken in question and answer form. The lieutenant testified that he would ask a question and after Cook's answer would proceed to type both the question and the answer. At 5:05 P. M. the five-page typewritten statement, which contained a detailed admission of guilt, was completed and signed on each page by Cook. The police testified that before signing Cook read the statement to himself for twenty minutes after which it was read aloud to him by one of the detectives. Near the end of the statement the following question and answer appear:

"Q. After reading tohe [sic, the] statement and listening to this statement being read to you are there any changes or corrections you wish to make?
A. Yes."

There were no changes or corrections made on the statement and the police testified that when Cook was asked if there were any changes he replied "No." They assert that the affirmative answer was a "typographical error" which the lieutenant "inadvertently" typed.

Following the taking of Cook's statement the police made arrangements for a psychiatrist to examine him. At 7:30 that evening Cook was seen by Dr. Samuel Kesselman who testified that Cook, who had left school in the second grade at the age of 13, told him "he could read pretty good but can't write too good." As a result of the examination the psychiatrist found that, although Cook's memory and "general knowledge for his level was fair," his "insight was lacking and [his] judgment was impaired." Dr. Kesselman did not note any marks on Cook's body and Cook did not complain of any pain or ill health. However, during the examination Cook was wearing a shirt and shorts and Dr. Kesselman was not primarily concerned with ascertaining Cook's physical condition.

At about 10:30 the next morning, April 23, Cook was given a complete physical examination by Dr. Paul O'Conner, a police surgeon. Dr. O'Conner testified that he found a 6″ x 6″

contusion and area of redness on Cook's abdomen and a similar contusion, measuring 4″ x 4″, on his left thigh, both of recent origin. During the examination Cook said that these contusions resulted from his being hit by the police. The existence and size of the contusions were corroborated by the police lieutenant who brought Cook to the examination.

Following the physical examination and approximately 32 hours after his arrest, Cook was taken before a magistrate for a preliminary hearing. At this time he did not complain of being beaten by the police. Because Cook was not yet represented by counsel, the hearing was postponed until May 6. The magistrate's courtroom is adjacent to Newark Police Headquarters and is connected by a corridor.

On April 23 John P. Brady, a chemist, examined the black-handled knife found when Cook was arrested as well as the shirt, trousers and shoes he was wearing when he was first taken to police headquarters. He found no traces of blood on the knife, shoes or trousers, but did find on the shirt a spot of human blood which he was unable to type. Brady testified that the knife was "very clean" except for rust marks on the blade. He was unable to determine when the rust marks had been formed. In a hypothetical question Brady was asked whether washing in water would remove all traces of blood from a knife. At first Brady testified that, notwithstanding a washing shortly after a knife came in contact with blood, some traces would probably remain. However, a subsequent answer to a similar question on cross-examination was somewhat confusing:

"Q. I take it on occasions you have been able to find blood stains following a washing? A. Yes, there is washing and immersion and, usually, over short periods of time you will find blood. When a knife is washed you don't usually find blood."

Cook took the stand and testified out of the presence of the jury on the issue of the admissibility of his written state-

ment and oral admissions.[4] After the trial judge ruled the confessions admissible and after the State rested its case, Cook again testified, this time before the jury, concerning not only the confessions but also his activities on the night of the killings, his prior relationship with Louise Hammonds and his personal background. He denied any connection with the killing of Betty or Charlotte Hammonds. He testified that shortly before midnight on April 21 he left the Dreamland Tavern with Louise and went with her to the Hammonds apartment where they found Eligh asleep. They remained in the apartment until after midnight and then went to the Tic Toc. Louise left with Junior Simpson and some others at about 12:30 A. M. while he remained in the Tic Toc for another half hour before returning directly to 2 Cottage Street and going to bed.

Cook testified that after he was arrested he was taken to police headquarters where he was interrogated and beaten by an unidentified detective before being fingerprinted and sent to his cell. At 8:00 A. M. he was taken from his cell and questioned continuously until sometime after noon. He claimed that while in the police interrogation room he was kicked, hit with a rubber hose on his legs, hit on the back of the head with a telephone book and made to lie on his back on a desk where he was hit with a baseball bat which struck a book placed on his stomach. Only after these beatings, Cook alleges, did he make his oral and written confessions.

Both as part of the State's main case and on rebuttal all of the police involved in either the arrest or interrogation of Cook denied that he was subjected to any physical or psychological coercion. Several other non-police witnesses who observed Cook briefly at police headquarters also testified that he did not appear to have been beaten.

---

[4] The trial judge in this case ordered that all the evidence relating to the admissibility of the written statement and oral admissions be initially heard by him outside the presence of the jury. See *State v. Walker*, 33 *N. J.* 580, 592 (1960).

On March 8, 1965, shortly before the trial, Cook was examined on behalf of the defendant by Dr. Hirsch Silverman, a clinical and consulting psychologist. Dr. Silverman testified that Cook was a "slow learner" whose I. Q. generally ranged from 55 to 80. Like Dr. Kesselman, he found that Cook's "judgment was impaired."

The testimony concerning Cook's personal history revealed that he was born in Florida in 1916. He left school after the second grade and went to work as a farm hand and woodcutter. When he was 17 he moved to Georgia and while there was convicted of breaking, entry and robbery for which he spent 13 years in prison. In 1953, four years after his release, he moved to Newark where he lived until his arrest. While living in Newark Cook worked continuously for the Johns Manville Company. He testified that he was married and the father of three children. He was divorced in 1961.

## I.

Cook first contends that the consolidation of the two indictments was error. We find no merit in this contention. *R. R.* 3:5–6 provides that the court may order two or more indictments to be tried together if the offenses could have been joined in a single indictment. *R. R.* 3:4–7 provides that two or more offenses may be charged in the same indictment if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Each of the two murders charged here was clearly part of a single occurrence, and evidence tending to prove one crime tends equally to prove the other. There can be no doubt that the consolidation came within the broad terms of the rule, and we cannot find that under the facts of this case the jury was prejudiced solely because it was confronted with a double murder. See *State v. Coleman*, 46 *N. J.* 16, 24 (1965); *State v. Begyn*, 34 *N. J.* 35, 56–57 (1961); *State v. Manney*, 26 *N. J.* 362, 365–366 (1958).

## II.

At the beginning of the trial Cook moved to suppress the black-handled knife and his confessions on the ground that they were the products of an illegal arrest made without either a warrant or probable cause. The trial judge denied defendant's motion,[5] and defendant now asserts that this denial violated his rights under the Fourth Amendment of the Federal Constitution. See *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed. 2d* 441 (1963).

We find no merit in defendant's position. Probable cause sufficient to justify an arrest without a warrant exists when the police have information which under the circumstances reasonably leads them to believe that a crime has been or is being committed by the person arrested. *Beck v. Ohio,* 379 *U. S.* 89, 91, 85 *S. Ct.* 223, 13 *L. Ed. 2d* 142, 145 (1964) ; *State v. Doyle,* 42 *N. J.* 334, 346 (1964). In reaching this belief the police are not limited to evidence admissible in a courtroom. See *State v. Burnett,* 42 *N. J.* 377, 387 (1964). In *State v. Mark,* 46 *N. J.* 262, 271 (1966), this court said that probable cause "is a commonsensible rather than a technical concept. It deals with the reasonable probabilities upon which officers must often act quickly for the protection of society rather than with the proof beyond reasonable doubt which the State must have to proceed to trial and conviction." See also *Brinegar v. United States,* 338 *U. S.* 160, 176, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1890–1891 (1949).

In the present case the police officers were summoned to 284 Mulberry Street in the middle of the night where they found the bodies of two little girls, each of whom had been viciously murdered. At the scene they found the person,

---

[5] Defendant's motion was made long after the 30-day period in *R. R.* 3:2A–6 had elapsed. Over the State's objection the trial judge proceeded to consider the merits of his motion. Because of his denial of the motion it was unnecessary for him to consider whether defendant's delay in making the motion was justified.

Eligh Hammonds, who had initially notified the police and who identified himself as the uncle of the victims. He told them that Cook had argued with the mother of the children only a few hours earlier and that the argument had ended in a threat in which Cook indicated he would get revenge. From their own experience the officers also knew that Cook had threatened the mother of the children on two recent occasions, once with a baseball bat and once with a revolver. In these circumstances we are convinced that the police had probable cause to believe that Cook was the culprit and that the police acted reasonably in going immediately to his apartment to apprehend one whom they believed to be a vicious killer. See *State v. Miller,* 47 *N. J.* 273 (1966) ; *State v. Fair,* 45 *N. J.* 77 (1965).

Defendant does not contend that the seizure of the blackhandled knife was not incident to the arrest, and since we have found the arrest to be valid the admission of the knife into evidence did not violate his rights under the Fourth Amendment. And in view of our holding it is not necessary to consider the State's contention that the confessions would be admissible even if the arrest were invalid. See *State v. Jackson,* 43 *N. J.* 148, 168–170 (1964).

### III.

When he was first arrested, and later at the trial, Cook maintained his innocence. He contends that his oral and written confessions were the product of police coercion and that, therefore, their admission in evidence violated the due process clause of the Fourteenth Amendment.

Before the confession of an accused may be received in evidence, the State must carry the burden of establishing that the defendant's will was not overborne and that the confession was "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 1879, 6 *L. Ed. 2d* 1037, 1057 (1961). Where the trial court has admitted a confession into

evidence our review of the record must be "wide and penetrating" to assure that the fundamental fairness requirement of due process is met. *State v. Smith,* 32 *N. J.* 501, 544 (1960).

██ Notwithstanding the exaggeration, inconsistency and apparent untruthfulness of some of defendant's testimony relating to the circumstances attending the giving of his confession,[6] our review of the record leaves us unconvinced that the State has borne its burden of proving that Cook's oral and written confessions were voluntarily made and that the fundamental fairness requirement of due process has been met. In reaching this conclusion we have not attempted to weigh the credibility of the various witnesses who testified at the trial, a task best left to the trial judge and jury. See *State v. Taylor,* 46 *N. J.* 316 (1966). Rather, we base our determination on evidence which was either produced by the State or uncontroverted.

██ Soon after Cook was arrested in his apartment and his hands handcuffed behind his back, he was taken by the police to 284 Mulberry Street where the bodies of the two girls still lay. While he was there one of the officers forcibly bent him over until his face was only six inches from the body of Betty Hammonds and asked him if he committed the crime. Cook made no reply. While it is impossible to accurately measure the effect of this episode on Cook's ability to deal with subsequent police interrogation, this type of over-zealous conduct might well tend to shatter an accused's mental composure. In *Davis v. United States,* 32 *F. 2d* 860 (9 *Cir.* 1929), a somewhat similar situation arose. There in a homicide case the defendant, while asserting self-defense, was taken to a morgue at 3 :00 A. M. to view the deceased after which he changed his story and confessed to murder. On this basis alone defendant's conviction was reversed. See also *Stevenson v. Boles,* 221 *F. Supp.* 411 (1963), affirmed 331

---

[6] Defendant even denies some parts of the State's case favorable to his position, *e.g.,* the examination by Dr. O'Conner which revealed the contusions.

*F. 2d* 939 (4 *Cir.*), modified 379 *U. S.* 43, 85 *S. Ct.* 174, 13 *L. Ed. 2d* 109 (1964). In the present case Cook did not confess until ten hours after he was forced to view the body; however, because of the harsh manner in which the viewing occurred we feel that this episode must be considered a relevant factor in the over-all determination of voluntariness. *Cf. State v. Coleman, supra,* 46 *N. J.,* at *pp.* 31–32.

On the morning of April 23, the day after he confessed, Cook was examined by a police surgeon who found a 6″ x 6″ contusion and area of redness on his abdomen and a similar contusion, measuring 4″ x 4″, on his left thigh, both of recent origin. While there may be some explanation other than police mistreatment to account for these contusions, no such explanation appears in the record. *Cf. State v. Taylor, supra,* at *p.* 329.

In Cook's written statement[7] taken on the afternoon of April 22 he was asked if there were any changes or corrections he wished to make. According to the statement the answer to this question was "Yes," although the police testified that Cook answered "No" and that the affirmative answer was an inadvertent error on the part of the lieutenant typing the statement. We find this type of error in a signed written confession very disturbing. While it may well be that Cook did in fact answer "No," it can be inferred that when he read the statement and when it was read to him he did not fully understand its contents. Mention should also be made here of the manner in which Cook's written statement was taken. The testimony shows that the lieutenant who interrogated Cook was seated at a typewriter reducing the ques-

---

[7] As discussed earlier (see footnote 3), before Cook gave his confession he was told that his statement could be used *for* or against him in any subsequent court action. We note that this advice is misleading. Were an accused to make an exculpatory or self-serving statement, he would not generally be entitled to use it as evidence on his own behalf. *State v. Baldwin,* 47 *N. J.* 379, (1966) (slip opinion *p.* 16–18) ; see also *State v. Whitlow,* 45 *N. J.* 3, 19–20 (1965) ; *State v. Cerce,* 22 *N. J.* 236, 247 (1956) ; *State v. Leo,* 80 *N. J. L.* 21 (*Sup. Ct.* 1910) ; 6 *Wigmore on Evidence* § 1732 (3d *ed.* 1940).

tions and answers to sentence form. In *State v. Smith, supra,* a case also involving a confession taken by the Newark police, we expressed disapproval of this method of recording an accused's statement. Speaking for the court Justice Hall said:

"* * * The result is, of course, not *verbatim* quotation of the subject and the final language is that of the typist. We may say that this is not a desirable method of taking a confession. The person's own words are most important and such can best be assured by a fairly conducted question and answer interrogation taken down stenographically and then transcribed by a qualified reporter. * * *" 32 *N. J.,* at *pp.* 554–555.

 Finally, we find testimony which shows that Cook is a "slow learner" who never passed the second grade. His I. Q. generally ranges between 55 and 80 and he was described as lacking insight. Witnesses for both the State and the defendant testified that his "judgment was impaired." In determining the issue of a confession's voluntariness we have held that the mental capacity of an accused is a relevant consideration. *State v. Puchalski,* 45 *N. J.* 97, 101 (1965); see "Developments in the Law—Confessions," 79 *Harv. L. Rev.* 935, 976–977. Although a subnormal mentality does not of itself make a confession involuntary, *State v. Ordog,* 45 *N. J.* 347, 360 (1965), Cook's low intelligence is a factor which must weigh against a finding that his confessions were the product of a free and unconstrained will.

While one or more, but less than all, of the factors discussed above might not have been sufficient to justify a finding that Cook's oral and written confessions are inadmissible, after considering the totality of the circumstances we cannot say that it convincingly appears that Cook's confessions were in fact voluntarily made. In the light of 1) the police behavior in pushing his head close to the body of a victim, 2) the unexplained (by the police) contusions on his abdomen and thigh, 3) the mistaken answer in his written confession and 4) his low mentality, we do not find the State has met its burden of proving that Cook's oral and written confessions were the products of a free and unconstrained will. We

therefore hold that Cook's written statement and his oral admissions were improperly introduced into evidence and the convictions must be reversed.

Reversed and remanded for a new trial.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.