**Howard J. ST. JULES**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections.**

**Civ. A. No. 70–H–840.**

United States District Court,
S. D. Texas,
Houston Division.

Feb. 28, 1974.

Harry H. Walsh, Huntsville, Tex., for plaintiff.

Dunklin Sullivan, Asst. Atty. Gen., Austin, Tex., for defendant.

*Memorandum and Order*:

SINGLETON, District Judge.

St. Jules filed his case August 8, 1970. He alleged that his conviction for burglary was constitutionally invalid because he was denied a lawyer at post-arrest interrogation and was coerced into a confession. He had pleaded not guilty to the crimes, but a jury found him guilty and he was sentenced to life imprisonment by virtue of the Texas recidivist statute.

On October 2, 1972, the court heard testimony on the merits. At the close of testimony, the court asked St. Jules if there were any more contentions which he desired to bring before the court. St. Jules indicated that his original petition for habeas corpus had asserted the jail clothes question and that he would like to reassert his contention that he was prejudicially tried in jail clothes. The court allowed him to do this and directed the state to answer these allegations. The hearing was then recessed. On July 23, 1973, the court heard testimony concerning the jail clothes issue.

*Exhaustion*

On March 21, 1972, this court denied without a hearing St. Jules' application for writ of habeas corpus for failure to exhaust. The state had alleged that St. Jules had not applied to the state court pursuant to art. 11.07 of the Vernon's Ann.Texas Code of Criminal Procedure. St. Jules alleged that he had applied but that the application had been either lost or ignored. The Fifth Circuit reversed the decision and directed this court to conduct an evidentiary hearing to determine whether the state court delays were justifiable and to proceed to hear the merits of the case should the delays prove unjustified. St. Jules v. Beto, 462 F.2d 1365 (5th Cir. 1972).

Since that time, the state courts have acted on the petition, and, on June 7, 1972, the Texas Court of Criminal Appeals sent St. Jules a postcard informing him that his petition was dismissed without written order. St. Jules has, therefore, exhausted his state remedies as to all questions.

*Coerced Inculpatory Statements*

The facts in this portion of the case are only partially in dispute. St. Jules' version of the facts is found only in his testimony given at a hearing to suppress the statements held at the time of his trial on the merits; he did not testify at the October 2 hearing in federal court. The police and sheriff's officers involved testified in both state and federal court hearings.

St. Jules was arrested by a Harris County sheriff's deputy around 10:00 a. m., August 2, 1967. He was taken promptly before a magistrate who charged him with attempted burglary and warned him of his constitutional rights. St. Jules was questioned by the sheriff's officers about the attempted burglary and asked about other burglaries in the area. St. Jules testified that he was told by the officer "that he was going to let me take one case with attempted burglary to clear up the rest of

these burglaries and that, 'I will see won't anything else happen to you.' " [1]

The sheriff's officer testified that he had told St. Jules that if he told the county about the other burglaries that the county would press only the attempted burglary charge but that he could not speak for the city of Houston or any of the other cities in the Houston area. St. Jules told the officer about other burglaries he had committed. He drove with the officer around a neighborhood and pointed out a home on Wayne Street which he said he had burglarized.

Thereafter, St. Jules was returned to the county jail and then taken by city police officers to the city jail where he was taken before a magistrate, told of his rights to remain silent and to have counsel present. He was not, however, charged with any crime. He was taken to an interrogation room and questioned about a particular burglary (the one with which he was subsequently charged and convicted). When asked how they found out about St. Jules, one of the policemen testified that they got a call from the county that they were holding a man who had pointed out a house on Wayne Street in which he had committed a burglary and had stolen a television. St. Jules was questioned about this burglary, taken to the house, and then to the house of his cousin to whom he had sold the television which he had stolen during the burglary. The next afternoon he was charged by the city of Houston with burglary. The Harris County attempted burglary charge was dropped.

■ The inculpatory statements which St. Jules made were coerced. It is conceded that St. Jules was "given his rights" at least three times, possibly more, by magistrates and police officers. Yet, from the time the questioning about other burglaries began, he was under the impression that he was "getting himself straight." [2]

Although the county deputy sheriff may have believed he was making himself clear when he told St. Jules he was speaking only for the county, he obviously led St. Jules to believe that he would be safe in talking to the county about the burglary. The county did not follow the bargain it led St. Jules to believe he had made. It takes little imagination to see that the county officials called the city officials and told them about the crime for which St. Jules was ultimately convicted. He was then turned over to the city and was questioned by the Houston police. St. Jules had made some allegations in this court that he was threatened by the police when they discovered that the brand of the television they found was different from the one St. Jules said he had stolen. St. Jules never testified directly to this point. The police officers testified that it would have been impossible for them to have threatened St. Jules in the way that he alleged.

Although St. Jules was not directly coerced by the Houston police, we hold that he was indirectly coerced by the Harris County deputy sheriff. The promise St. Jules quite logically believed the deputy had made to him lulled him into a sense of security. He felt that his statements concerning the burglary on Wayne Street would never be used against him. This sense of security

---

1. State Court Record on Appeal, p. 62.

2. The following exchange took place between St. Jules and the District Attorney:
"Q And then, as I understand it, you told him [city police officer Texter] where he could recover this TV and cooperated with him?
"A Yes. He told me if I cooperated with him that they won't let nothing happen to me and they'd let everything go as it is.

"Q Now, I didn't quite understand all that. If you cooperated—what?
"A In other words, he told me if—now, he told me if I got along with Deckman [county deputy sheriff] all right, that I was okay. You know, I was a man to get my business straight and if I want to get everything straight, to come on get it straight."
State Court Record on Appeal, pp. 69–70.

stayed with him even after he was transferred to the city jail.

Although one of the city police officers testified that he was unaware of any promises made by the county to St. Jules, St. Jules testified that the officer told him about 7:00 p.m. the day of his arrest, and after he said he had asked for a lawyer, that if St. Jules cooperated "they'd let everything go as it is." See footnote 2 above. At the magistrate's warning session he was not formally charged with any crime and even though the policeman testified that the magistrate mentioned "other burglaries," it is not hard to see that even if the city police did not promise him anything, St. Jules continued to be under the impression that he was not going to be prosecuted for the Wayne Street burglary. It is perfectly possible that until 2:00 p.m. on the day after his arrest, when he was told by a bailiff that he was charged with two burglaries and theft, St. Jules was under the impression that he was just "getting himself straight."

St. Jules was a layman, without a lawyer. The state contends he waived his rights to a lawyer and against self-incrimination when he failed to heed his *Miranda* warnings. Those warnings are not, however, magic words which, when said, absolve the interrogator from all error.

The Supreme Court has said in Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694:

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation."

St. Jules was placed in custody, was interrogated by a sheriff's deputy in the deputy's office, was tricked into confessing an extraneous offense, believing that his confession would not be used against him, and was then turned over to the city for questioning. After the city police officers questioned him further he was informed that he was charged with the burglary. This was approximately 28 hours after his arrest by the county, during which time he had been continually questioned on and off by both city and county officials and taken to the scene of the crime. The conduct of the sheriff's officers was inconsistent with the warning St. Jules was given: the circumstances under which his inculpatory statements were given were those which *Miranda* sought to prevent. For this reason, we find St. Jules' statements were coerced.

*Denial of Counsel*

St. Jules was arrested by a Harris County Sheriff's officer at 10:00 o'clock in the morning. He was taken to the Harris County Jail and within fifteen minutes was taken before a magistrate, charged with attempted burglary, and told his rights to remain silent. St. Jules could not remember if he had been told that he could have counsel. He testified that at that time he requested counsel but none was provided. Rather, he says he was told he could use the telephone to contact a lawyer but was never given the opportunity to use the telephone. After being dismissed from the magistrate's court, the sheriff took St. Jules immediately to his office and began to ask him questions.

When St. Jules was turned over to the city police, he was again taken to a mag-

istrate and warned of his rights. The magistrate asked him if he had an attorney and he testified he replied that he did not because he had no money to hire one but that he would like to have one "at the present time." However, none was provided. St. Jules testified that when they left the magistrate he asked the city police officer if he could have a lawyer with him and the officer replied, "You're going to get one, don't worry about that now." [3]

The testimony of all law officers was in marked contrast. They testified that never after any of the many warnings did St. Jules ask for a lawyer and that had he done so questioning would have stopped until one was provided. Upon cross-examination, however, one of the city officers admitted that St. Jules had never been queried directly about whether or not he wanted a lawyer and never said he did not want an attorney—he simply remained silent.

The Fifth Circuit has said in Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972):

> "Under the Constitution, any suspect of a crime is guaranteed the rights to assistance of counsel and to remain silent during in-custody police interrogation, and any statement obtained in derogation of those rights is inadmissible in a subsequent criminal prosecution . . . . The suspect may, of course, waive these rights provided the waiver is knowingly and intelligently made." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

However, as the Supreme Court cautioned in *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.".

■ An express statement that the defendant does not want a lawyer is not required. United States v. White, 451 F.2d 696 (5th Cir. 1971). The prosecution must show, however, "that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them." United States v. Montos, 421 F. 2d 215 (5th Cir. 1970).

■ The state has not met its burden. The circumstances which surrounded the interrogation of St. Jules made his understanding and intelligent waiver of counsel as well as right against self-incrimination impossible. When the police make deals with defendants, Miranda warnings oftentimes become mere ritualistic formulas.

We hold, therefore, that St. Jules was denied the assistance of counsel at his pretrial interrogation.

*Jail Clothes*

■ St. Jules alleged and testified that he was tried in jail clothes. His lawyer remembered that the clothes were white but did not remember the stenciling which would indicate to a jury whether the clothes were jail garb. A federal marshal testified that jail inmates always, to his best recollection, were provided with jail clothes on which was stenciled "Harris County Jail." The court finds he was tried in jail clothes.

■ St. Jules testified that he had street clothing available, but he did not know he would be tried until he arrived in the courtroom. He felt then that it was too late to ask for his street clothes because his lawyer and the jury panel were already present. He had not discussed the question with his attorney. St. Jules' attorney testified that he was a court-appointed lawyer who practiced oil and gas law. He stated he was not as familiar with the subtleties of criminal defense tactics as one who had made his living at it, and it never occurred to him to object to St. Jules' clothing. He said that even if it had occurred to him he probably would not have been inclined to

---

3. State Court Record on Appeal, pp. 68–69.

object to the jail clothes for fear that he would "upset the apple cart." He explained that by this he meant he did not want to antagonize the judge who had been very helpful to him in his attempts to defend St. Jules. We believe that the attorney's reason for not objecting are as compelling as those of the attorney in Hernandez v. Beto, 443 F.2d 634, 637 (5th Cir. 1971) and that the attorney's inaction did not constitute "voluntary waiver" of the jail clothes issue.

For the same reasons we find that failure to object was not a trial strategy. Although the attorney testified that under the circumstances he felt St. Jules would make a better impression in white jail clothes than in the usual attire of those in the downtown jail facilities, since it never occurred to him to object to any jail clothes, his testimony cannot be taken as evidence that he employed the white jail clothes as a trial tactic for jury sympathy. *Cf.* Hernandez, *supra* and Garcia v. Beto, 452 F.2d 655 (5th Cir. 1972).

The last remaining question is whether the wearing of jail clothes at trial was harmless beyond a reasonable doubt. Hernandez, *supra;* Thomas v. Beto, 474 F.2d 981 (5th Cir. 1973).

A reading of the transcript of the trial reveals that the defense was based primarily on an attempt to have St. Jules' exculpatory statements excluded. When this failed, the defense relied only on cross-examining the state's witnesses and put on no testimony of its own. The jury heard testimony from the complaining witness and one of the city policemen to whom St. Jules made his inculpatory statements. Nevertheless, we do not believe that all the evidence leads "unerringly to guilt"[4] nor that, under the circumstances, the wearing of jail clothes was harmless beyond a reasonable doubt. There are two circumstances which prompt this conclusion.

First, after St. Jules was brought before the jury and the indictment was read, he pleaded guilty. The jury was retired and the judge conferred with St. Jules' lawyer. The lawyer then entered a not-guilty plea. The jury returned, St. Jules pleaded not guilty, and the trial went on. Affidavits contained in the state record indicate that this plea was at least mentioned in the jury room, although the affidavits go on to say the verdict was not based on the first plea. The fact that St. Jules pleaded guilty the first time taken together with the fact that he was wearing jail clothes makes even a stronger case for a finding that his right to a presumption of innocence was infringed upon by the jail clothes.

Further, however, is the consideration that the jury was confused by the case and had to have the testimony of the police officer read back to them. The transcript reveals:

"The foreman: Well, we have no testimony of the defendant and we have no testimony of the defendant to consider.

"The court: That's right. And you are not to even consider the fact that he did not testify in this case.

"The foreman: No, we are not. And since we have all of the patrolman's testimony that he made a statement—there's no written statement to consider here. It's only an oral statement.

"The court: Well, let me ask you, Mr. Ragan, are you in dispute as to what the witness—was it Texter— what he testified about? Is there a dispute among members of the jury?

"The foreman: There's dispute among the members, yes, sir, as to the point—

"The court: As to what he testified to, or as to some hiatus in the events of the night?

"The foreman: Well, we don't know when this man was arrested, and someone had brought up the point whether the man was even in jail at

4. Compare Thomas v. Beto, *supra.*

the time when the theft occurred. We have knowledge as to when he was arrested, and someone thinks that it's possible that the man was already in jail at this time. It's under question as to where he was at the time of the theft. It's also—there's no proof been established that Mr. St. Jules even broke into the house. No suggestion has actually been—no proof has actually been presented that he broke in. All the proof we have, in other words, to consider is a point that he did sell to his cousin this TV set."

A conference with the lawyers followed and the judge asked if there were some dispute about what Officer Texter testified to. The foreman answered:

"The foreman: The man's answer to the issue—the charge whether or not St. Jules broke into this house. We have absolutely no proof at all as to whether he broke in. Someone else could have broke in and stole this set and give it to St. Jules to sell and therefore, he could have taken it over to this cousin's house and sold it to him. We have no proof at all, no suggestion even, that St. Jules even broke into the house. That seems to be the main point of the charge there.

"The court: Is there any member of the jury that feels otherwise, Mr. Ragan?

"The foreman: Well, we have one member that's holding on this point." The court then asked if the conflict could be resolved by having the testimony of Texter read; the foreman answered, "We might have it read and see if it—there might be something brought out there." The testimony was then read.

We believe that this colloquy taken together with the state's case, reveals that there was some question in the minds of the jury about St. Jules' guilt. For this reason we cannot say, beyond a reasonable doubt, that St. Jules' jail clothes did not prompt the guilty verdict in some way and was a circumstance amounting to harmless error.

It is, therefore, ordered, adjudged, and decreed that petitioner's writ of habeas corpus be, and the same is hereby, granted.

Further, the state is ordered to retry the petitioner in the case in question, in the 177th District Court of Harris County, No. 128,047, styled The State of Texas v. Howard James St. Jules, within ninety (90) days or to dismiss the case and discharge the prisoner. The state will inform the court of its decision.