143 N.J. Super. 96 (1976)
362 A.2d 1183
STATE OF NEW JERSEY, IN THE INTEREST OF J.P.B., A JUVENILE. STATE OF NEW JERSEY, IN THE INTEREST OF A.W.T., A JUVENILE.
Superior Court of New Jersey, Appellate Division.
Argued March 8, 1976.
Decided July 15, 1976.
*98 Before Judges CARTON, CRAHAY and HANDLER.
Mr. William L. Roughton, Jr., Assistant Deputy Public Defender argued the cause for appellants (Mr. Stanley C. Van Ness, Public Defender of New Jersey, attorney; Mr. William D. Knowlton, Assistant Deputy Public Defender, of counsel and on the brief).
Mr. Daniel C. Hoffman, Esq., Legal Assistant argued the cause for respondent (Mr. William Doherty, Cumberland County Prosecutor, attorney).
*99 The opinion of the court was delivered by HANDLER, J.A.D.
J.B. and A.T., juveniles, were adjudged delinquent upon a finding that they robbed and murdered one Malcom Tyler. The central issue on these consolidated appeals is whether particular confessions, the only evidence linking them with the crime, were improperly admitted at their trial.
The testimony at trial was that Tyler disappeared on March 28, 1972. He was described as 43 years old, about 5'5", of slight build and with crew-cut length brown hair. Tyler lived in rooms he rented at the home of a Mr. and Mrs. Turpin in Port Norris. In the month preceding his disappearance it had become common knowledge in the community that he had inherited approximately $2,600 from his mother's estate and that he was in the habit of carrying large sums with him.
Early in the evening of March 28, 1972 the Turpins left their home to go to a movie. They did not see Tyler as they left, but they heard the sound of his television set in his room and noticed that his car was parked outside. They locked the front door on their way out. Edward Cox, a friend of Tyler's and a part-time bartender at the Marina Bar in Port Norris, testified that on that same evening Tyler was at the Marina Bar and "drinking pretty good," so much so that Cox eventually refused to serve him further. Shortly thereafter, at about 7:30 or 8.00 P.M., Tyler left the bar. When he had not seen the lights on Tyler's car go on or heard the car start after a few minutes, Cox went outside to investigate  he wanted to make such particularly that Tyler had not damaged his (Cox's) truck, which was parked next to Tyler's car. He discovered that Tyler was having difficulty locating the ignition with the key and started the car for him. He watched as Tyler drove off down the road toward his home. Cox remained at the bar until 10:00 or 10:30 that night; Tyler did not return during that time.
The Turpins testified that when they returned at about 9:30 p.m. that night they again noticed Tyler's car parked *100 outside; the front door was unlocked and the evening newspaper, which Tyler was in the habit of bringing in, was inside. Lights were on in Tyler's room and the television was playing, but much louder than it had been earlier. The television and the lights in Tyler's room were on all night, and early the next morning the Turpins called his sister to come and check on him. When they entered his room Tyler was not there and his sister reported to the police that he was missing. About $100 in bills and change was found in a jar in the room.
Five months later a man mowing salt hay in a marsh a short distance from the Marina Bar ran over and picked up with the tractor-drawn mower the badly decomposed, essentially skeletal remains of a body. The body was that of Malcom Tyler. Henry Hayes, who found the body, said that it was one-half to three-quarters of a mile from the bar. State Police Detective Zeuner, who participated in the investigation, said that it was only about 500 yards from the bar; Tyler's home was slightly more than half a mile from the bar by way of the road but about 800 yards from the bar across a field.
The medical examiner was of the opinion that death was caused by an epidural hematoma resulting from a blow to the head. He stated that such a blow could have been caused by a fall. He could not determine, because of the condition of the body, how soon death followed the trauma to the head, but stated that it could have been instantaneous or the victim could have lived for up to several days, during which he could have been ambulatory for some time. The crime remained unsolved until the police received information, through a probation officer, that a juvenile, J.B., had confessed to mugging someone outside the Marina Bar.

I
In November 1973 J.B., then 16 years old, was committed to the Highfields Residential Group Center in Hopewell. Highfields is a state institution to which juveniles are committed *101 as a condition of probation upon adjudications of delinquency. N.J.S.A. 30:4-177.31. As part of the Highfields program residents are required to participate in what is called "guided group instruction." Residents are assigned to a group as they enter Highfields and thereafter meet regularly with them. Generally, each 90-minute session focuses exclusively on one "student's" problems.
Albert Axelrod, the Superintendent of Highfields, testified that the premise of the group sessions is that only by dealing honestly with themselves and their past anti-social behavior can the residents begin to be rehabilitated. It is part of the rehabilitation process, Axelrod stated, to draw things out which are locked in a resident's mind so that troubling or terrifying thoughts may be looked at and dealt with. Participants are therefore encouraged (in Axelrod's phrase) to "bare their souls." Although no formal regulations are issued, it is understood by all involved that "What you say in the group will stay in the group." It is also understood that failure to participate fully can result in being returned to court as unsuitable for the Highfields program, which in turn is understood to mean revocation of probation and confinement at Yardville.
The first session to focus on J.B. was that of December 18, 1974. It is traditional at Highfields that at his first meeting a resident gives his life history, including "all problems with the law * * *." During the early part of the evening, J.B. informed the group that he had just finished "doing time" at Stokes. ("Stokes" is the Stokes Forest unit of the Youth Correctional Institution at Annandale.) Axelrod stated that he knew  based on J.B.'s records and history and Highfield's entrance requirements  that this could not be so and confronted J.B. with his lie, telling him that he'd be hurting himself in the program if he lied. Later in the evening J.B. stated that he had been involved in a mugging and that at some subsequent date he learned that the victim might have died. Axelrod's best recollection of J.B.'s admissions is as follows:
*102 He and his accomplice followed the individual, I believe, down a road. He struck this individual with a pipe, the individual fell, and his accomplice then struck the man rather forcefully in the head with his pipe at least once. Then I think he took the man's wallet and fled, and then he added that some time later, several months later, they heard that a body had been found in this area and that they felt that this was the individual that they had assaulted.
Axelrod testified that on previous occasions he had been privy to revelations of criminal activity during group meetings but that he had never taken any action concerning that information. Following the December 18 meeting, however, he called J.B.'s probation officer and related the incident. Shortly thereafter Axelrod was visited by two State Troopers who convinced him to question J.B. further about the killing, and particularly the identity of his accomplice. Axelrod complied with their request and at a group meeting held on January 3, 1974 directed questions at J.B. for the specific purpose of determining who his accomplice was. The name was revealed by J.B. and, following the meeting, Axelrod gave it to the State Police. Axelrod had not told J.B. prior to the January 3 meeting that he had made any mention of J.B.'s confession to the police; neither did he give J.B. the Miranda warnings nor make any attempt to contact J.B.'s parents with regard to his further questioning of J.B.
On February 14 two State Troopers, Detective Sergeant Hunter and Detective Graham, went to Highfields to interview J.B., arriving between 1 and 2 P.M. Although J.B. was apparently given Miranda warnings at the outset of the interview, no attempt was made to contact his parents at that time. At approximately 3 P.M., the troopers advised Axelrod that they wished to take J.B. to Trenton for a polygraph examination. Axelrod gave his permission.
Hunter testified that J.B. initially denied any involvement in the Tyler death after being told by Hunter that information "from the street" linked him to the incident. Hunter pushed the point that his information seemed reliable, but that J.B. could clear himself by a polygraph examination. J.B., who is classified by his I.Q. as "dull normal," *103 agreed to the test. When Hunter contacted the polygraph unit, someone there raised the question of parental permission and Hunter responded that Axelrod could give such permission.
The polygraph test was administered by State Police Detective Vona, and lasted from about 3:15 P.M. until after 5:00. Prior to the test Detective Vona was told of J.B.'s admissions in the group meetings.
Following the examination Detectives Vona, Hunter and Graham met with J.B. to discuss the test. Vona told the other troopers in J.B.'s presence that the test showed that he had lied and that he "was guilty of the crime but would not admit it." J.B. denied that he had lied, but Vona pointed out specific lies revealed by the examination. Finally, confronted with the test result, J.B. agreed to give a statement and admitted to being involved in the Tyler killing. The formal statement was taken after J.B., Hunter and Graham had supper and returned to Highfields. Although J.B. was again read the Miranda warnings, his parents had still not been contacted and he was not told that he could call them. The statement was begun at 7:55 P.M. and completed at 9:25 P.M. Approximately half-way through the statement, when J.B. had not yet named his accomplice, Axelrod interrupted and took him into the hall. During their private conversation Axelrod, for the first time, informed J.B. that the confidentiality of the therapy group had been breached and that the information he related in the group had been delivered to the State Police. J.B. then continued his statement and named his accomplice. At no time were J.B.'s parents called, and at no time during the entire eight hours of custody was he advised that a parent or other relative could be with him during questioning.
The trial judge ruled that all of J.B.'s statements were inadmissible except that made at the first group meeting on December 18, 1974. Statements made at subsequent group meetings were properly excluded. Axelrod, having gone to the police and thereafter having questioned J.B. at *104 their request, had become an agent of the police and was therefore required prior to questioning J.B. to give him the Miranda warnings. This he failed to do. The results of the polygraph test were rejected because the juvenile had not consented to their introduction. State v. McDavitt, 62 N.J. 36, 46 (1972). And the formal statement was excluded as involuntary because it was obtained without the juvenile's parents having been present and informed of the questioning and given the Miranda warnings. State in Interest of S.H., 61 N.J. 108 (1972); State in Interest of Carlo, 48 N.J. 224 (1966); State in Interest of B.D., 110 N.J. Super. 585 (App. Div. 1969), aff'd o.b. 56 N.J. 325 (1970). Additionally, the judge ruled that the statement was obtained as a result of police exploitation of the polygraph test, which itself was unlawfully administered to the juvenile without proper consent of his parents. See e.g., Wong Sun v. United States, 371 U.S. 471, 487-488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
The juvenile maintains on this appeal that the initial statement made on December 18 should also have been excluded. We agree.
The context in which that statement was elicited constituted custodial interrogation. Axelrod was employed by the State as a supervisor of a state institution directly involved in dealing with juvenile offenders. The questioning conducted by him was by virtue of his authority as an agent of the State. The group session at which the incriminating statement was given focused upon J.B. as the primary subject. While the session's concentration on J.B. was not literally an investigation of J.B. as a criminal suspect or an interrogation directed to any particular crime, it was nevertheless aimed at uncovering personal anti-social behavior and its thrust was the revelation of the individual's past history, including criminal acts. Moreover, the questioning had coercive aspects. In addition to the custodial setting, each boy participating in the group therapy sessions was instructed to give a full statement of his personal problems, *105 including criminal behavior when he was the subject or focus of the particular meeting. Also, it was generally understood among the "students" at Highfields that failure to cooperate fully in the group sessions would entail sanctions and that unresponsive person would be considered "unsuitable" for the Highfields program and be remanded to the court for sentencing to Yardville.
This congerie of factors constituted the essential ingredients which trigger Miranda protections  custodial interrogation under state authority directed against one believed to have been involved in crime. In these circumstances the Miranda warnings were required to be given in order that incriminating statements obtained could be admitted into evidence at a criminal trial or juvenile hearing. See Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); cf. State v. Graves, 60 N.J. 441 (1972). In State v. Davis, 67 N.J. 222 (1975), an analogous situation arose with respect to statements made to a parole officer. Defendant had been charged with another offense while on parole. While in custody he was questioned by his parole officer, who did not read him the Miranda warnings, and made some admissions which conflicted with his alibi. The parole officer's questions relating to defendant's whereabouts on the date of the crime were relevant to whether he was adhering to the conditions of his parole as well as to his alibi. The court observed that "the Miranda rule is not applicable to the routine parole interview between a parole officer and a parolee." 67 N.J. at 226. It held, however, that, where defendant was questioned in custody, his statements could not be used against him in a criminal prosecution unless Miranda warnings were given and defendant properly waived his rights:
* * * to attempt to use that in-custody statement outside the framework of the parole system and at * * * [a] criminal trial * * * implicated defendant's constitutional rights and would require a showing that [he] had first been advised of such rights under Miranda and had knowingly and voluntarily waived them. [at 227]
*106 Accordingly, we hold on Miranda grounds that the statement initially obtained from J.B. was not properly admissible in his trial for juvenile delinquency.
Exclusion of the statement of J.B. was also sought on other grounds. It was claimed that the statement was privileged. Axelrod, however, was not a "licensed practicing psychologist" and the rejection of this basis for exclusion was proper. Evid. R. 26A-1; N.J.S.A. 45:14B-28. It was also urged that the statement should be excluded for reasons of fundamental fairness and due process. This contention is meritorious.
When, as here, the State exacts information under a promise or assurance of confidentiality, it cannot, consistent with due process and fundamental fairness, violate that confidentiality and defeat the expectations raised by its promise by using the information in a criminal trial as incriminating evidence against the one who offered it.
We are persuaded to this holding by its essential soundness and the decisional authority of those jurisdictions which have considered the problem. In Killough v. United States, 119 U.S. App. D.C. 10, 336 F.2d 929 (D.C. Cir.1964), defendant made certain admissions to a jail employee who was interviewing him for the purpose of determining how he was to be classified as an inmate. It was the practice of the jail to assure inmates who inquired that anything said during such classification interviews would not be used against them. In reversing defendant's conviction obtained in part on the basis of information confided to the jail employee the court said:
The purpose underlying the questioning confirms [an implied promise of confidentiality]; it was inherently a confidential purpose to enable the Jail best to treat the person committed to its care. The rule of fundamental fairness required by the due process clause in our view, does not permit use of the incriminating statements made to the Classification Intern in a criminal prosecution under the circumstances present here. [at 932]
Accord, Commonwealth v. Edwards, 318 Pa. 1, 178 A. 20 (Sup. Ct. 1935). Conversely in Tyler v. United States, 90 *107 U.S. App. D.C. 2, 193 F.2d 24 (D.C. Cir.1951), cert. den. 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed.2d 1326 (1952), statements made to a prison classification officer were permitted to be used at a later criminal trial, but defendant raised no claim of a promise of confidentiality. Compare People v. Anderson, 536 P.2d 302 (Colo. Sup. Ct. 1975), admitting statements made to a parole officer after Miranda warnings, with People v. Parada, 533 P.2d 1121 (Colo. Sup. Ct. 1975), excluding statements made after Miranda warnings where the warnings had been followed by a promise that the statement would not be used. See also, St. Jules v. Beto, 371 F. Supp. 470 (S.D. Tex.), aff'd on other grounds sub nom. St. Jules v. Estelle, 505 F.2d 656 (5 Cir.1974) (confession given on promise of confidentiality was not voluntary); People v. Jackson, 36 N.Y.2d 922, 373 N.Y.S.2d 536, 335 N.E.2d 845 (Ct. App. 1975); People v. Rockower, 296 N.Y. 369, 73 N.E.2d 555 (Ct. App. 1947).
We are satisfied that the use of the statement given by J.B. on December 18, 1973 in the trial against him for juvenile delinquency was contrary to basic standards of due process and fundamental fairness, and, as previously stated, reliance upon it as inculpatory proof at the trial did not comport with the constitutional privilege against self-incrimination. It should not therefore have been received in evidence. Since J.B.'s adjudication of delinquency was based entirely on his inadmissible statement, it is reversed.

II
The accomplice named by J.B. was the juvenile A.T. The day after they obtained J.B.'s formal statement the State Police went to question A.T., who was then 15 years old. Finding no one at the house where A.T. lived with his mother, Detectives Hunter and Graham went to the junior high school which A.T. attended, but did not find him there either. They checked the home again, and again found no one there. At noon they found A.T. at school *108 and arrested him. He was read the Miranda warnings and taken to the State Police barracks at Port Norris for questioning. The detectives attempted to contact his mother, stopping at the house and telephoning from Port Norris, but were unsuccessful.
At the Port Norris barracks A.T. was again read the Miranda warnings and was advised that efforts were being made to contact his mother (his parents were separated.) He denied any involvement in the murder of Malcom Tyler and agreed to go with the detectives to Mays Landing to be given a polygraph test. Graham testified that he advised A.T. that he did not have to take the test and could wait for his parents. Another unsuccessful attempt was made to telephone Mrs. T. before Graham and Trooper Hannah took A.T. for the test, and Graham left instructions for another officer to keep trying to reach her.
A.T. arrived at the Mays Landing barracks with Graham and Hannah at about 3:25 P.M., and Detective Sergeant Dicks questioned him, with the polygraph machine, from 4:00 until 5:25. After the test Dicks informed Graham and Hannah that there was some slight indication that A.T. had knowledge of Tyler's murder, and all three detectives then questioned A.T. further. A.T. was told that someone had implicated him in Tyler's murder, but he again protested his innocence  at least at first. During the questioning A.T. was given many details of the crime: the date and location of the attack (naming the Marina Bar); where the body was found; that Tyler had been hit over the head with a blunt instrument and robbed, and that he was white and about 45 years old. He was also told that the polygraph test showed that he was lying. He persisted in maintaining that he was innocent through an hour to an hour and a half's further questioning, until he was told of J.B.'s confession implicating him. Having been told that J.B. had said that it had been he (A.T.) who actually had beaten their victim, A.T. then admitted that he had been with J.B. when the mugging took place but claimed that J.B. alone had *109 done the beating. He agreed to give a formal statement. The questioning ended at 8 P.M.
Accompanied by Graham and Hannah, A.T. arrived back at the Port Norris barracks at 9:30 P.M. Mrs. T. was waiting for them and, after Graham explained the situation to her, asked to speak to A.T. alone. A.T. testified that while he spoke to his mother the door was open and Detective Graham was outside where he could hear what was being said. He stated that when he told his mother that he was innocent and did not know anything about the crime Graham came back into the room, slammed a book onto the desk and told him, "If you don't tell her the same story you told us, we'll charge you with murder one." A.T. then said he would give the statement. Mrs. T. also recalled Graham's threat that unless A.T. gave a statement he would be charged with "murder one." Graham denied any threats.
At about 10:30, with Mrs. T.'s consent and after having been given the Miranda warnings in her presence, A.T. began his statement. At 10:45 Mr. T. and a Mrs. A.B., a friend of the family, arrived but did not talk to A.T. during the statement. In pertinent part A.T. said:
Me and [J.B.] was down at the Marina Bar and a man was coming out the side door of the bar. [J.B.] walked up behind the man and looked at me and this was the sign for me to come on. [J.B.] picked up a stick and asked me if I was going to hit the man. I said no, and he called me a punk mother fucker, and he hit the man in the back and the man fell forward, then he picked up a piece of metal pipe that was by the Marina and hit the man in the head. I got scared and ran. As I was running away he again called me a punk mother fucker for leaving and not hitting the man. We ran to the shell pile and I was standing by the pump and when he came by I asked him how much money he got from the man. He said $80.00 and gave me $20.00 and said not to tell anyone. I asked him what happened to the man. He said it was none of my business, and said "stop bugging me." A couple months later we hear a man's body had been found in the marsh. I asked [J.B.] if he thought it was the man he hit. He said "don't worry about it 'cause I don't think so." I also asked him if he thought it could be another man he hit; he never answered me. I kept on asking him and he said not to say anything about him robbing the man, and that was it. *110 A.T. described the man who was hit as "a white man, about 35 to 40 years old, about medium size, silky hair  I think it was grey."
Mrs. T., who was present during the taking of the statement, which contradicted what A.T. had told her previously, said that she did not object because she understood that she could later get a lawyer and A.T. could change the statement. A.T., who had been told the contents of J.B.'s statement and given details concerning the time and place of the attack, Tyler's description, how he had been killed and where the body was found, said that he lied and made up the contents of the statement because "I figured [J.B.] lied on me, why not lie back on him?"
The trial judge agreed with the juvenile that the polygraph test and the other preliminary questioning were improperly conducted in the absence of A.T.'s mother. This ruling was correct. State in Interest of S.H., 61 N.J. 108 (1972); State in Interest of Carlo, 48 N.J. 224 (1966); cf., State in Interest of A.B.M., 125 N.J. Super. 162, 168 (App. Div. 1973); State in Interest of R.W., 115 N.J. Super. 286, 296 (App. Div. 1971), aff'd o.b. 61 N.J. 118 (1972). The judge, however, admitted the formal statement on the basis that it was given after Mrs. T's arrival and in her presence and after the giving of Miranda warnings, and sufficiently long after the improper police conduct so that it was not tainted. In doing so the court erred and we reverse.
We cannot agree with the trial judge that Mrs. T's arrival and her brief talk with A.T. before he gave his formal statement dissipated the taint of the prior illegal conduct. The judge failed completely to deal with the factual evidence of taint. When Mrs. T. arrived, Detective Graham confronted and advised her of A.T.'s previous statements. He did this on more than one occasion. And he further indicated to her that another person had also implicated A.T. in the Tyler murder. After conditioning her in this fashion, he again spoke to her, in A.T.'s presence, and advised her what her son had previously said. At one point he admonished A.T. *111 for not telling his mother what he had told the officers before. At the taking of the formal statement itself he repeated what A.T. had said before as well as what the third person had stated concerning A.T.'s involvement in the crime, giving some "specifics." Moreover, at the point in the formal statement dealing with the "murder of Malcolm Tyler," when A.T.'s father appeared, Detective Graham "again went over" with the father together with the mother and A.T. "about the same thing" that had previously been related concerning A.T.'s prior confessions.
The conclusion is inescapable that the written confession under these circumstances was "merely a reprise" of what A.T. had disclosed during the illegal interrogation. State in Interest of S.H., supra, 61 N.J. at 115. Plainly, it was produced by it. Id.; see Wong Sun v. United States, supra, Since A.T.'s adjudication was based solely upon his tainted confession, we reverse.

III
In addition to their inadmissibility because they were improperly obtained, both J.B.'s and A.T.'s confessions should have been excluded for lack of corroboration.
It is well established that a conviction for crime may not be based solely upon an uncorroborated confession. State v. Lucas, 30 N.J. 37 (1959). The majority of jurisdictions require proof aliunde of the corpus delecti in order to corroborate a confession. See 7 Wigmore, Evidence, § 2070 et seq. The New Jersey test, however, is that "the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury * * *." State v. Lucas, supra, 30 N.J. at 56. And, not only must independent facts be proved which substantiate the confession but, at least where juveniles are concerned, its trustworthiness must also be demonstrated by a showing that its particulars were not the product of suggestion *112 by the authorities. State in Interest of B.D., 110 N.J. Super. 585 (App. Div. 1969), aff'd o.b. 56 N.J. 325 (1970). As Chief Justice Weintraub said in concurring in State in the Interest of Carlo, supra, "because of the ease with which some boys may yield to suggestion, I would insist upon a quantum of corroboration we do not now demand with respect to confessions of adults." 48 N.J. at 245. Thus, juvenile confessions have been held inadmissible for lack of corroboration, even where their details are consistent with independently proven facts, if there was no indication that in the course of their interrogation the police withheld material information from the juvenile in order to test his reliability. State in Interest of B.D., supra, 110 N.J. Super. at 596.
With respect to J.B.'s statement of December 18, 1974, as recalled by Axelrod, its contents are far too vague to be capable of any meaningful corroboration. J.B. gave no description of the victim and no clear indication of the time or place of the assault. His statement that he took the wallet and fled is in direct conflict with the proof that Malcom Tyler's wallet was found in his pocket when his body was recovered.
A.T.'s formal statement, which was admitted at trial, contains many discrepancies with the known facts. A.T. stated that J.B. assaulted a man as he came out of the Marina Bar and he fell there. Cox testified, however, that when Tyler left the bar on the night of his disappearance he got into his car and drove off, and other evidence suggests that he in fact reached his home before leaving again. A.T. placed the date as "over a year and a half ago," which would be several months after Tyler's disappearance. Additionally, A.T.'s statement followed the disclosure to him of various details of Tyler's disappearance, his description and how, when and where he had been killed. He was also fed details of J.B.'s formal statement which (though excluded from evidence) contained more specific information than contained in his earliest statement but which was itself inconsistent in material respects with other proven facts. The statement of A.T. *113 contains no specific details which had not been disclosed to A.T. and which could have been corroborated by the known facts. See State in Interest of B.D., supra.
We also point out that J.B.'s and A.T.'s confessions cannot be used to corroborate each other. The statements are inadmissible for corroboration purposes under the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which prohibits, as a violation of the confrontation clause, the use of a codefendant's confession implicating the defendant when the codefendant is not available for cross-examination. In the context of this trial, corroboration of the respective confessions of each of the juveniles was an essential element in the State's case. State v. Lucas, supra. In that frame of reference corroboration is tantamount to implication. Hence, an accomplice's confession used for the purpose of corroborating the confession of the other juvenile would necessarily implicate him. State v. Johnson, 31 N.J. 489, 504 (1960). But cf. State v. Ordog, 45 N.J. 347, 364 (1965), cert. den. 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed. 2d 1025 (1965). Ordog, however, was decided before Bruton and is not viable authority. (After Bruton, Ordog successfully petitioned for a writ of habeas corpus. United States ex rel, Ordog v. Yeager, 299 F. Supp. 321 (D.N.J. 1969) (relying on Bruton)).
In sum, whether used as direct evidence of guilt or as essential corroboration, the confession of a codefendant so used would violate the principles of Bruton. In this case, the statements of J.B. and A.T. could not be admitted for purposes of cross-corroboration.
We have noted other arguments advanced on behalf of the juveniles. In light of the decision reached here for the reasons expressed, they need not be addressed. The adjudications of juvenile delinquency are reversed.
CARTON, P.J.A.D. (concurring in part and dissenting in part).
I agree with the majority that the trial judge erred *114 in admitting into evidence the admission made by J.P.B. at the session held at Highfields on December 18, 1974 and that the adjudication of delinquency must be reversed as to him. This statement and the more detailed confessions he ultimately made were highly incriminatory. However, given as they were in the context of what may be described as a custodial setting, they were inadmissible under the principles of the Miranda doctrine.
Since the court is in agreement on this conclusion, considerations of judicial restraint would dictate that we express no opinion as to whether the statement could perhaps also have been excluded for reasons of fundamental fairness and due process. On this score, the majority expresses as a general proposition that where the State exacts information under a promise or assurance of confidentiality it cannot, consistent with due process and fundamental fairness, violate that confidentiality and defeat the expectations raised by its promise by using the information in a criminal trial as incriminatory evidence against the one who offered it.
The accuracy of such an all-embracing pronouncement as a statement of the law in this area is hardly demonstrable. Statements of this kind have no place in a complex and developing field of law and may only serve to frustrate the ends of justice under circumstances which may arise in the future and which we cannot now envision.
The strong reasons of constitutional dimension which preclude the admission of J.B.'s incriminating statements have no application, however, to A.T., and I would affirm as to him.
Recall that the questioning of A.T. came about as a result of J.B.'s implicating him in the mugging, not as a result of police harassment. It should be noted also that A.T. himself acknowledged on voir dire that he had been involved with J.B. in another mugging. At the time of the sentence he was in the ninth grade at junior high school. His probation report reveals that he was on probation at that time for another *115 offense and that he had also been adjudicated a delinquent on a variety of serious charges.
Recall also that A.T. had been given the Miranda warnings before he was first questioned at the State Police Barracks; that the police then attempted to contact his mother; that he was again given the Miranda warnings; that efforts were still being made to reach his mother, and that A.T. was so informed. Trooper Graham testified also that he informed A.T. that he did not have to take the polygraph test and could wait for his parents. It should be noted also that when A.T. was informed that J.B. had implicated him as an accomplice, the thrust of his position was not that he was not involved in the venture, but that J.B. alone had done the actual beating of the victim.
The trial judge, after a voir dire, excluded the statements which A.T. had made earlier in conjunction with the administration of the polygraph test. However, on the basis of the evidence before him he determined that the later written statement, made in the presence of A.T.'s parents after they, too, had been given the benefit of the Miranda warnings, was not tainted by the earlier statement and the circumstances surrounding it. He found that a sufficient interval had elapsed in which the juvenile had been given the benefit of parental guidance and in which his constitutional rights had been recognized.
However, based upon its own review of the evidence, and from a cold record, the majority has come to an opposite and totally unwarranted conclusion. That conclusion reflects a misconception of this court's appellate function. In doing so it has ignored determinations and findings of fact which were peculiarly within the province of the trial judge and fully supported by the evidence which he heard from witnesses whose demeanor he had the opportunity of observing.
There was actually nothing in the record to suggest that A.T. was coerced or overborne in any way. Indeed, the record points to the contrary. Although he was in custody for a few hours and given the polygraph test and questioned *116 while efforts were being made to contact his mother, the juvenile does not claim that he was subjected to oppression or abuse. The questioning was not continuous or badgering. In fact, it was interrupted by coffee breaks, opportunities for smoking and dinner.
It will be recalled that when the troopers arrived back at Port Norris Mrs. T. requested and received permission to speak to her son alone. The record is not clear as to the exact language of the discussion which took place between the troopers, A.T. and his mother at that time, or in exactly what sequence the various parts of it occurred. It seems clear, at least, that both A.T. and his mother claimed that A.T. told his mother the troopers had said there was a body found close by the Marina Bar and that he said to his mother: "I ain't never robbed nobody down at the Marina Bar."
An important part of A.T.'s testimony is the claim that Trooper Graham was present and overheard the conversation between A.T. and his mother. Graham testified to the contrary  that he took them to a separate room and was not in the room at the time. Graham stated that Mrs. T. came out of the room where she had been closeted with her son and said, "He will tell you the truth now."
The suggestion made by A.T. that the trooper overheard the conversation that took place between him and his mother because Graham was in the hallway outside the door is not corroborated by A.T.'s mother. Significantly, she was unable to recall whether the door to the room she and her son were in was open or closed. If Graham's testimony is accepted that A.T. had an opportunity to talk in private with his mother and outside of Graham's hearing, it negates any idea that A.T. was denied the benefit of the independent advice of the one most in a position to render it. It also refutes any suggestion that improper coercion or psychological pressure played a part in his ultimate decision to make the statement.
*117 Tending to support the trial judge's conclusion that the statement was knowingly and voluntarily made and untainted, is the fact that Mrs. T. consented to its making and was present when it was given. Miranda warnings were given when she was present and before A.T. began to make the statement. A.T.'s father and a Mrs. Bell, a friend of the family, also came to the station while A.T. was in the midst of making the statement. The father was advised of the situation and the Miranda warnings were repeated still once again, this time in the presence of the father. A.T. continued to make the statement while the father remained. A.T. acknowledged in writing that he received the warnings, as did both parents and Mrs. Bell.
Against this factual background I see no basis whatsoever for substituting this court's determination for that of the trial judge that the statement was knowingly and voluntarily given. Here the trial judge had the benefit of hearing the extensive testimony of the juvenile and the other witnesses, and the opportunity of observing their conduct and assessing their credibility. That determination, supported as it is by the record, is entitled to great weight and ought not be disturbed.
The majority's further conclusion that the adjudication of delinquency as to A.T. cannot stand because his confession lacked sufficient corroboration represents in my view an interpretation of the corroboration doctrine which is consonant with neither the law nor the facts in the present case. The corroboration rule, to the extent it has been adopted in New Jersey, does not require that there be corroborating evidence tending to prove the actual crime. It requires only that there be corroborating evidence sufficient to establish the overall reliability of the confession. In State v. Lucas, 30 N.J. 37 (1959), referred to in the majority opinion, the court reviewed the history of the doctrine, noting that it has evolved from widely reported instances in England and the United States where individuals had confessed to murder and were hanged solely on the basis of their confessions, *118 only to have the alleged victim turn up "very much alive."
The Lucas court noted (at 57) that "[t]he evil at which the corroboration rule was aimed was not that the death which was confessed to was in fact accidental rather than felonious, but rather that there was, in fact, no death at all," and that this objection was "overcome by the requirement that the State prove independently of the confession only the fact of loss or injury."
After a further review of the arguments concerning the quantum and quality of proof required according to different views, the court announced this guiding principle:
* * * No greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth, plus independent proof of the loss or injury. [at 58]
The present case presents no difficulty with respect to the loss or injury. The victim's remains were found in the marsh and there was medical testimony that his death resulted from a fall on or blow to the left side of the head. The victim's body was found in the immediate area of the juvenile's home and near the Marina Bar.
Examination of A.T.'s statement reveals that it was not simply a pro forma one consisting of a naked confession of guilt. It is in narrative form, in a style and language appropriate to the author's background. It contains details which are internally consistent and which bespeak authenticity hardly capable of fabrication. Theoretically, of course, A.T. could have fabricated some of the statement merely upon his hearing of the discovery of the body. However, considered against the backdrop of circumstances shown by the entire record, his statement bears the unmistakable ring of truth  this wholly aside from any reference to the damning and vivid corroborating details set forth in J.B.'s statements and A.T.'s earlier statement.
*119 In my estimation there was more than sufficient corroborating evidence tending to establish that the juvenile was telling the truth when he made the statement. See State v. Lucas, supra. What the court said in Lucas has special application to the present circumstances:
Confessions, like other admissions against interest, stand high in the probative hierarchy of proof. It is for this reason that the law imposes various safeguards designed to assure that the confession is true. But safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment. * * * [30 N.J. at 57-58; emphasis supplied]