61 N.J. 108 (1972)
293 A.2d 181
STATE OF NEW JERSEY IN THE INTEREST OF S.H., JUVENILE-APPELLANT.
The Supreme Court of New Jersey.
Argued June 5, 1972.
Decided July 7, 1972.
*110 Mr. William J. Rohr, Assistant Deputy Public Defender, argued the cause for juvenile-appellant (Mr. Stanley C. Van Ness, Public Defender, attorney; Mr. William J. Rohr, Assistant Deputy Public Defender, of counsel and on the brief).
*111 Mr. Wilbur H. Mathesius, Assistant Prosecutor, argued the cause for State of New Jersey (Mr. Bruce M. Schragger, Mercer County Prosecutor, attorney; Mr. Bryan V. Moore, Assistant Prosecutor, of counsel and on the brief).
The opinion of the Court was delivered by PROCTOR, J.
A juvenile delinquency complaint in the Mercer County Juvenile and Domestic Relations Court charged that the appellant, S.H., age 10, caused the drowning of B.R., age 6, by pushing him into a canal. The court found that the appellant was a juvenile delinquent. However, it reserved decision as to whether the offense would be manslaughter or second degree murder had the act been committed by a person of the age of 18 or over until it received the report of the Menlo Park Diagnostic Center to which it committed S.H. for 90 days for examination. Upon receipt of the report the court determined the act would be second degree murder if done by an adult and committed S.H. to the State Home for Boys for an indeterminate period of time. S.H. appealed to the Appellate Division and before argument there upon defendant's application the procedings were certified to this Court.
There is no dispute as to the facts. On March 17, 1970, three boys, E.J., age 7, W.W., age 8, and B.R. were returning to school in Trenton after lunch. A short distance from the school S.H. approached the boys, accused them of beating up his sister, and asked for some money. The boys denied beating up his sister and refused to give him any money. S.H. then punched W.W. in the face and took B.R. by the coat into an adjacent alley. The two other boys continued to school. B.R. did not return to school or to his home that evening.
The following day, March 18, the Trenton Police Department began a missing person's investigation of B.R. That morning Sergeant John Girman, along with two patrolmen, went to the school S.H. attended. At 11:00 A.M. in the presence of the vice-principal they spoke to S.H. He was *112 not a suspect at this time, as the police did not know whether or not B.R. was the victim of foul play. S.H. was being questioned because the police had information that he was one of the last persons to see B.R.S.H. told the police that he had seen B.R. on Brunswick Avenue with W.W. and E.J. He said they were approached by a boy named Leroy who hit one or both of the older boys and took B.R. away with him. S.H. said he then went to school. After the questioning S.H. returned to class.
That same day, after speaking to W.W. and E.J., the police returned to S.H.'s school at 1:00 P.M. and asked to see the boy again. They questioned him as to the identity of Leroy. After describing Leroy, S.H. suddenly began to cry and said Leroy threw B.R. into the canal. He agreed to show the police the place where Leroy had thrown the boy. Shortly thereafter the police and fire departments along with S.H. went to the canal and he showed them the place where Leroy pushed B.R. into the water. He also told them B.R. floated down the canal and he pointed out the spot where he last saw him go under. At 3:30 P.M.B.R.'s body was discovered about 300 feet from where S.H. said he saw Leroy push the boy into the water.
After the body was found, S.H. told the police he would take them to Leroy's house. They arrived at the address S.H. gave them about 4:45 P.M., where he identified a certain boy as Leroy. Investigation showed that the boy was not named Leroy, was in school at the time of the episode and was in no way involved.
Thereafter, at about 5:00 P.M., the police took S.H. to the first precinct Trenton Police Station. After discussing the matter with other policemen, Sergeant Girman concluded a homicide had occurred and S.H. was a prime suspect.
When S.H. arrived at the police station, his father was already there. However, the police told Mr. H. he was not needed at that time and he left the station and went home. Sergeant Girman turned S.H. over to Detective Purdy *113 of the Juvenile Bureau of the Trenton Police Department. The detective took the boy to a room on the second floor usually used to interrogate adults. Alone in the room with S.H., the detective read the boy his Miranda rights from a card, explaining what they meant as he went along. According to the detective, he spent about 10 minutes explaining the Miranda rights. The following colloquy adduced at the hearing shows the nature of the explanation and the extent of S.H.'s understanding of it:
"THE COURT: Well, what were his responses to your [explanation of the Miranda warnings]?
MR. PURDY: And he would say yes and no to me in answer; along with the yes and no's he would also shake his head. And I would move on because I felt that he did know, what the answer was that he was giving me. When he said yes, I would move on. And when he said no, then I would explain to him further.
The entire interrogation lasted about 90 minutes.
About 6:30 P.M., after the interrogation was completed, the police picked Mr. H. up at his house and brought him to the station house. He was taken to a second floor room where he found four policemen. S.H. was brought in by Detective Purdy from the adjoining room where the questioning had taken place. The detective then asked S.H. to tell his father what he had told him during the interrogation. The boy complied.
At the hearing the State called Mr. H. and asked him what S.H. had told him in the presence of the police. Defense counsel objected to the State's use of the father to testify against his son. The objection was sustained. The State then put Detective Purdy back on the stand to relate what S.H. told his father. Purdy told the court that S.H. said, "I walked the boy down by the railroad crossing. And we got by the creek [canal] and, I mean by the water, and I pushed him in." Sergeant Girman was recalled for the same reason. He said S.H. told his father, "I pushed [B.R.] into the canal." This testimony was admitted over defense counsel's objection.
*114 The State rested and after motions of defense counsel were heard and denied the defense rested without calling any witnesses.
On this appeal appellant contends his confession was the product of police coercion and therefore its admission into evidence violated the due process clause of the Fourteenth Amendment. In a juvenile case where a serious offense is charged, before the confession of an accused can be received in evidence against him the State has the burden of establishing that the accused's will was not overborne and that the confession was the product of a free choice. State in the Interest of Carlo, 48 N.J. 224, 233-234 (1966). We are not satisfied the State has borne its burden of proving that this confession was voluntarily made and that the fundamental fairness requirement of due process has been met.
The circumstances under which the station house interrogation was conducted showed a complete disregard for the well-being of the accused juvenile. Placing a young boy in the "frightening atmosphere" of a police station without the presence of his parents or someone to whom the boy can turn for support is likely to have harmful effects on his mind and will. See Carlo, supra at 239; In re Rutane, 37 Misc.2d 234, 234 N.Y.S.2d 777, 780 (Fam. Ct. 1962). Not only was S.H. interrogated in the police station but he was isolated in a room with a detective for a period of 90 minutes. The State's proofs account for only 10 minutes of this period, that used to give and explain the Miranda warnings. There is nothing in the record to show what occurred during the remaining 80 minutes except Detective Purdy's testimony of what the boy told him about the episode (the same story which he told his father in the presence of the police). More significant is the action of the police in sending the father away from the police station before questioning the boy. We emphasize whenever possible and especially in the case of young children no child should be interviewed except in the presence of his *115 parents or guardian. Carlo, supra at 241; Standards For Specialized Courts Dealing With Children (Children's Bureau, Department of Health, Education and Welfare, 1954) at 39. That the police allowed Mr. H. to be present immediately after the interrogation in order to secure a separate confession in no way detracts from our conclusion. This second confession was merely a reprise of what the boy told Detective Purdy when he was secluded alone with him in the room and at best was nothing more than the tainted product of the coercion which produced the first confession. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The conduct of the police in sending Mr. H. home from the police station when he had appeared in the interest of his son without more may be sufficient to show that the confession was involuntary. In light of the other circumstances, however, we need not pursue this point.
In reaching our conclusion as to the voluntariness of the confession, we have taken into consideration that the police gave S.H. the Miranda warnings and that he purportedly waived his rights. We think this factor, however, was of little or no significance in the present case. Recitation of the Miranda warnings to a boy of 10 even when they are explained is undoubtedly meaningless. Such a boy certainly lacks the capability to fully understand the meaning of his rights. Thus, he cannot make a knowing and intelligent waiver of something he cannot understand. However, questioning may go forward even if it is obvious the boy does not understand his rights if the questioning is conducted with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness. See State v. in the Interest of R.W., 115 N.J. Super. 286, 295-296 (App. Div. 1971), aff'd o.b., 60 N.J. 118 (1972). Such was not the case here.
Upon a consideration of the totality of the circumstances under which the appellant's confession was obtained, we cannot say it convincingly appears that his confession *116 was voluntarily made. In view of the appellant's age, the oppressive environment of the police station where the questioning was conducted, the lengthy period of interrogation (the nature of which is only partially explained) and the cavalier treatment of the father in sending him home when his boy most needed him, we cannot say the State has me its burden of proving the confession of appellant was obtained by methods consistent with due process. We therefore hold that his confession was improperly admitted in evidence.
A new trial, however, is not necessary. A juvenile hearing is not a criminal case; it is a civil proceeding, tried without a jury, and conducted in the interest of the juvenile and for the welfare of society. State v. Tuddles, 38 N.J. 565, 571-572 (1962). In such a case our Constitution and rules permit us to exercise such original jurisdiction as may be necessary to the complete determination of the cause on review. N.J. Const., Art. 6, Sec. 5, para. 3; R. 2:10-5; see State v. Taylor, 38 N.J. Super. 6, 21 (1955). In exercising that jurisdiction we have examined the undisputed evidence other than that contained in the inadmissible confession and find therefrom beyond a reasonable doubt that S.H. committed the act set forth in the charge and that he therefore requires rehabilitative treatment.
Prior to the arrival of S.H. at the station house, the police at first tried to find out the whereabouts of B.R. and then, upon learning of B.R.'s fate, attempted, with appellant's help, to reconstruct the events leading to the death of the young boy. The police were not sure a crime had been committed or that S.H. was involved in B.R.'s death, except as a witness. S.H. was important to their investigation, not because he was a suspect but because he possessed helpful information. No pressure was put on the boy to talk. Indeed, he was willing to help and seemed to be extremely cooperative. Thus, he was properly questioned prior to his arrival at the police station and his statements made at that time are admissible against him.
*117 A review of the admissible evidence completely satisfies us that S.H. pushed B.R. into the canal. S.H.'s description of Leroy's actions in stopping the three boys and taking B.R. away was shown, at the hearing, to be in reality the very actions of the appellant. S.H. was the only one who knew B.R.'s body was in the canal. He was the only one who knew the location of the body. And more significantly, he sought to place the blame on an innocent boy. These facts leave no doubt in our minds that the appellant caused the death of B.R.
We are not convinced, however, that appellant's act would constitute murder if committed by an adult rather than manslaughter. Malice differentiates murder from manslaughter. Ordinarily, proof of an intent to kill or to do grievous bodily harm is necessary to establish malice. State v. Williams, 29 N.J. 27, 36 (1959); see State v. Gardner, 51 N.J. 444, 458 (1968). We are not satisfied on the record before us that this 10 year old boy had the intent to kill or to do grievous bodily harm. The diagnostic report later furnished the trial court in connection with the disposition of the juvenile discloses that S.H. had an I.Q. "within the mild defective range of intelligence," and that he was "functioning severely behind the norm for his chronological age." This report supports our doubt of the existence of the mens rea required for murder. It shows that S.H. was physically 10 but mentally much younger. Under the circumstances the finding should be that the homicide is involuntary manslaughter.[*]
The judgment of the trial court is modified in accordance with this opinion.
*118 For modification  Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN.  7.
Opposed  None.
NOTES
[*] Commitment of a juvenile for an offense which would constitute any form of homicide if done by a person 18 years old or over is for an indeterminate period but not more than the maximum provided by law, N.J.S.A. 2A:4-37; the maximum for involuntary manslaughter is 10 years. N.J.S.A. 2A:113-5.