742 A.2d 971

STATE OF NEW JERSEY IN THE MATTER
OF O.F., JUVENILE–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 15, 1999—Decided December 23, 1999.

Before Judges PETRELLA, BRAITHWAITE and COBURN.

*Mark Winkler*, argued the cause for appellant (*Tarleton & Winkler*, attorneys; *Mr. Winkler*, on the brief).

*Susan W. Sciacca*, Deputy First Assistant Prosecutor, argued the cause for respondent State of New Jersey (*William H. Schmidt*, Bergen County Prosecutor, attorney; *Ms. Sciacca*, of counsel and on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

This appeal from a judgment of delinquency concerns a boy, O.F., who was twelve years old when the acts of delinquency were allegedly committed and thirteen when he confessed to some of them in the prosecutor's office.

O.F. and his accomplices, M.C. and D.A., were tried together for various offenses arising from a fire that destroyed a building known as National Wholesale Liquidators warehouse in Lodi on April 17, 1997. O.F. was adjudged a juvenile delinquent based on his commission of acts which if committed by an adult would be third-degree arson, *N.J.S.A.* 2C:17–1b(1); third-degree arson, *N.J.S.A.* 2C:17–1b(2); third-degree causing widespread damage, *N.J.S.A.* 2C:17–2b; and fourth-degree criminal mischief, *N.J.S.A.* 2C:17–3 (the first set of offenses). M.C. and D.A., with whom we are not concerned, were also adjudged delinquents for conduct prohibited by those statutes. In addition, for later conduct relating to attempts to avoid detection, O.F. was found to have committed acts which if done by an adult would be simple assault, *N.J.S.A.* 2C:12–1a(3); second-degree witness tampering, *N.J.S.A.* 2C:28–5a; and fourth-degree hindering apprehension, *N.J.S.A.* 2C:29–3 (the second set of offenses).

O.F.'s adjudications for the first set of offenses depended almost entirely on the admissibility of unrecorded statements he made during an initial interrogation in the prosecutor's office without

the benefit of *Miranda*[1] warnings and without the presence of the boy's mother, whom the prosecutor's investigator had persuaded to remain locked outside the interrogation room. Immediately thereafter, O.F. was asked to summarize his admissions in his mother's presence, which he did. Then he and his mother were given *Miranda* warnings, and O.F. reiterated his admissions in a recorded statement.

The trial judge concluded that *Miranda* was inapplicable to the first interview because the boy was not then in custody. He also determined that the admissions were voluntary despite the mother's exclusion from the interrogation room. Based on those conclusions and his further determination that the recorded statement was voluntary and taken in accord with *Miranda*, the results of both interviews were received in evidence. We disagree. Since we are satisfied that the boy was subjected to custodial interrogation during the first interview, the violation of *Miranda* requires suppression of the confession. We further conclude, apart from *Miranda*, that in the circumstances of this case the confessions were involuntary. Those conclusions necessitate reversal of the first set of adjudications and retrial. With one exception, simple assault, the judge also based his adjudications on the second set of offenses in critical part on the confessions. Therefore, except for the adjudication of simple assault, which is not challenged by O.F., these adjudications also must be reversed and remanded for trial.

I

We turn to O.F.'s primary contention, that the trial judge erred in admitting his confessions, mindful that "our review of the record must be 'wide and penetrating' to assure that the fundamental fairness requirement of due process is met." *State v. Cook*, 47 *N.J.* 402, 416, 221 *A*.2d 212 (1966) (citation omitted). The evidence on this issue was produced at a hearing on O.F.'s suppression motion.

---

1 *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Sergeant Adrian Cales, an investigator assigned to the Bergen County Prosecutor's arson squad, began his investigation of the fire shortly after it occurred on April 17, 1997. The fire had completely destroyed the building, which housed numerous retail concessionaires in a space of 132,000 square feet. At the time of the fire, there were over 30 employees and over 100 customers in the building. From his initial investigation, Cales concluded that the fire, which was discovered by employees shortly after it had begun, had started around 7:50 p.m. in the vicinity of Aisle 3, where cardboard boxes had been stored in shelves, and that it was "incendiary in nature." Among the products offered for sale were butane lighters and aerosol cans. Cales opined that someone had intentionally combined those materials to set the fire. He explained that someone using them must maintain the proper distance between the two or the aerosol spray will extinguish the lighter's flame.

The police were unable to identify any suspects for six months until, on October 16, Peter Marchetto called the Maywood Police Department and told Detective Sergeant Joseph Sacco that his son might have information about the fire. Marchetto agreed to bring his son to the police station for questioning. Sacco testified that the boy told him that he had overheard O.F. telling D.A. to tell M.C. how D.A. started the fire. At the time, Sacco believed that Prosecutor's Investigator Annette Orzetti was in charge of the investigation. He called her and she soon arrived at the police station. An hour-long interview ensued, during which Orzetti took notes. According to her report, based on her notes, which she later destroyed, Marchetto's son said that on the day after the fire he heard O.F. and D.A. telling M.C. how they started the fire with hair spray and a cigarette lighter in the automobile or hair care aisle.

The next day, October 17, Orzetti met with her superior, Lieutenant Winters, who told her to give the information she had learned from Marchetto's son to Sergeant Cales. According to

Orzetti, Cales asked for her notes, which she tore from her notebook. He later returned them to her.

The testimony of Sergeant Cales respecting the information he received on October 17 conflicted with that given by both Sacco and Orzetti in a number of respects. According to Cales, Orzetti was in the room but remained silent while he spoke to Lieutenant Winters, who advised him that "two juveniles possibly possessed information concerning the role and participation of a third juvenile in setting the fire." He said that Winters identified the possible witnesses as M.C. and O.F. However, in his report, Cales wrote, "Information and details had been provided by Det. Sgt. Sacco which indicated that [O.F.] might have had information regarding the fire." But Sacco, who arrived at the prosecutor's office after Cales had met with Winters and Orzetti, testified that he did not relate any information to Cales about the October 16 interview. Also, Cales said that Orzetti had advised him that "Sacco had taken notes of the [October 16] interview and that he had more information." But both Sacco and Orzetti testified that Orzetti was the only one to take notes of that interview.

Cales admitted on cross-examination that during the October 17 meeting he believed that Winters told him that D.A. had mentioned using hair spray and a cigarette lighter and that the fire started somewhere in the automobile or hair care aisle. As already noted, that information appeared in the report filed by Orzetti, which was based on the interview notes that she said she gave to Cales.

Implicit in the trial judge's findings of fact is the conclusion that Cales decided to interview O.F. without having determined that he was a suspect. Given the conflicting testimony described above and the nature of Cales's ensuing interrogation of O.F., that finding is questionable, to say the least.

In any case, Cales decided to take Sacco with him to find O.F.'s mother, G.K., to persuade her to let them interview her son. They approached her in the bank where she worked and told her that they wanted to speak with her son about a fire they were

investigating. She agreed to leave work and accompany the investigators to her son's school. An administrator brought O.F. to a room in which they were waiting. Cales told the boy that they wanted to speak to him about the National Wholesale Liquidators fire, and asked "if he would be willing to talk to us." When O.F. responded "pleasantly in the affirmative" they immediately arranged to sign him out of school and left the building. Neither O.F. nor his mother was asked if they were willing to go, and Cales did not explain why he did not question the boy in the school.

After a ten minute ride, they arrived at an office building in Hackensack which houses a number of investigative squads of the Bergen County Prosecutor. They passed through an exterior door, which is kept unlocked during working hours, into a ten-foot square lobby that is separated from the interior of the building by a door that can only be opened from the lobby by operating a combination lock. The lobby contains a bench. A large glass window separates the lobby from the interior.

Cales had Sacco sit with O.F. in the lobby while he brought G.K. inside into a conference room that had exterior windows. He testified that he told her he wanted to interview her son "out of her presence" because he "would be less reluctant to talk about things with her not there; that it's been my experience that juveniles are more open and candid with their information away from their parents." However, he admitted that O.F. was the only juvenile out of twelve interviewed during the investigation who did not have his parents present when interviewed. After G.K. allegedly agreed, Cales began reading a "Consent to Interview Juvenile" form to her. She became upset and said that she did not understand what he was saying.

Although G.K. had lived in the United States for many years, her native language is Spanish. Consequently, Cales asked if she would like to see the form in Spanish and have it read to her in Spanish. She agreed, and Cales brought in Orzetti who provided that service. The form authorizes the interview of the child and

states, as interpreted into English by Orzetti for the court, that "I give this consent . . . having knowing complete the rights of the constitutional of the juvenile." Cales conceded that at that point neither he nor anyone else had advised G.K. of any constitutional rights her son might have. Cales asked if she understood the form. She said she did and signed it.

G.K's recollection differs in important respects from that of Cales. She said that she signed the consent form without having been advised that she would not be present while her son was questioned. After she signed, Cales brought her back to the lobby. Then, Sacco, Cales, and her son began walking toward the interior door. She asked Cales if she could go with them. He replied, "No, no, not to—no, don't go because he, kids, they talk to us like friends." Over an hour passed before she next saw her son. During that time, she became increasingly upset. On one occasion, she rang a bell to get attention, but no one responded.

The trial judge did not make any specific finding of fact to resolve the differences between the testimony of Cales and G.K. as to whether she had consented to her son being interrogated outside her presence or was simply told that it would be done in that way. Although he said that Cales was a credible witness, he did not say that G.K. was incredible or mistaken in any respect. It is only by inference that we could determine that he found she had agreed to stay outside the building, locked away from her son.

The initial interview of O.F., which began a little after 11:00 a .m., was unrecorded and lasted an hour and ten minutes. The boy was questioned by both Cales and Sacco. According to Cales, he began by asking routine background questions, and then told O.F. that they had learned that he might have information about the National Wholesale Liquidators fire. When O.F. replied that he did not, Cales told him they had contrary information suggesting that he "might know something about what happened there" or might have overheard something about the fire. O.F. then admitted that he had been in the store the day of the fire, "but it was earlier in the afternoon."

Cales advised O.F. that "being in the store earlier on the day of the fire and having information about what happened weren't the same topic, is there anything more?" O.F. responded by changing his story and admitting that he had been in the store twice on the day of the fire, once in the afternoon, and then later in the evening. He also said he was there with M.C. and D.A. Cales pressed for details, and O.F. then said that they had been in the store "just before the fire happened, but he didn't know what took place." When Cales pressed for further information, O.F. admitted that he, M.C., and D.A. found aerosol cans in the store and "began chasing one another around the store."

After spending some time having O.F. describe the layout of the store in detail, Cales asked him "if he had ever been involved in the starting of any fires, or been involved with other people when other fires were started." O.F. admitted that "he had been involved in setting fires before, and he even made reference to one incident where he was involved in setting a fire. The police came, and he sort of laughed it off that, ah, they just took me home."

Cales then returned to the fire under investigation and told O.F. that he "was being less than truthful in providing the whole totality of what might have taken place there concerning the participation of one of the three names, his, [M.C.'s] or [D.A.'s], and what they could have possibly done in the store that night, singularly or specifically relevant to the information that we received." After further interrogation, O.F. admitted that "they were using aerosol spray cans and a lighter to make what he described as a flaming torch, and that the fire subsequently happened."

The interrogation then focused specifically on how the fire started. O.F. admitted that his cousin had taught him "how to make the flaming torch with the aerosol can and the lighter several years ago, and that the idea came up to make these flaming torches within the aisles." Then O.F. admitted that they were chasing each other around the store with the torches, that one of the torches "struck a box and allegedly set it on fire," and

that "he thought it was his flaming torch, but he didn't know what." When pressed for a time, O.F. said he thought the fire occurred between 7:35 p.m. and 7:45 p.m.

Cales wanted O.F. to identify the origin of the fire on a blueprint of the store. When he left the interrogation room to get the blueprint, O.F. asked Sacco, "[C]ould somebody go away to juvi for this?" According to Sacco, he responded by saying, "[Y]ou know, it's possible, it's a pretty serious case . . ., but I don't know . . ., I'm not making those decisions." O.F. then said the story he had been telling was not true and that they were "never at the fire or at the store." Sacco replied, "Well . . ., nobody's asking you to make up stories, just tell the truth . . ., eventually the truth is going to come out." O.F. responded, "Okay, yeah, we were there." Cales then returned with the blueprint. Sacco testified that he did not relate this discussion to Cales, and the interview continued. Cales testified that Sacco told him that O.F. had asked about going to the juvenile detention center and that Cales told O.F. "that's not our decision to make, that he should just tell us the truth as to what happened."

Cales placed the blueprint in front of O.F. and had him mark the locations where they had found the aerosol cans and where the fire started. Under further questioning, O.F. admitted again that "he thought it was probably his lighter that set the box on fire." He added that they "ran out of the store so that they wouldn't get caught. . . ."

Sacco admitted that at least a third of this interrogation took place after he thought O.F. was a suspect. Cales testified that at the conclusion of the interrogation he decided that the time had arrived for him to give *Miranda* warnings.

> I decided that the information that [O.F.] was providing indicated that he was in the area when the fire started. I didn't know if [O.F.'s] torch set the fire, I didn't know if someone else's torch set the fire, but I felt that at this point I needed to stop the interview with [O.F.] and bring [G.K.] back in the room and advise them both of their rights. . . . I felt that any further that I would have gone in the interview would have been pursuing [O.F.] as, Did you do it? Was it yours? . . . And I didn't want to do that without the Miranda rights being advised to him and [G.K.], and so I stopped.

Cales brought G.K. into the interrogation room and told her that O.F. had "told us about how the fire was started, and that he was in the building when it happened." She said she did not believe that. He replied by telling O.F. to tell her "basically" what he had just told them. After O.F. complied, Cales produced the *Miranda* warning form and asked G.K. if she wanted it read to her in Spanish. At her request, he proceeded in English after explaining that he was advising both O.F. and G.K. of their rights. He put the form in front of them and read it aloud. He asked each if they understood their rights. They said they did. He then asked G.K. if she "was going to allow us to continue to speak with [O.F.], and she said yes." Then he had G.K., but not O.F., sign the waiver. A statement was then transcribed with G.K. present during which O.F. reiterated the information he had already supplied with some additional details which are of little or no consequence.

## II

In *State in the Interest of Carlo,* 48 *N.J.* 224, 235, 225 *A.*2d 110 (1966), the Court emphatically declared that the constitutional safeguard of voluntariness applies to confessions in juvenile proceedings. Two boys, one age thirteen, the other fifteen, had confessed to killing a young girl. They had been picked up by the police and brought to the police station where they were each interrogated separately for over five hours until they confessed. Their parents made repeated efforts to see them but were rebuffed by the police on each occasion.

The Court expressed its concerns about the vulnerability of the youngsters and the dangers implicit in questioning without a parent present in these terms:

> The police denied the parents of these boys the opportunity to see them when the boys were being grilled about a·most horrible crime and were in the greatest need of a friend. Boys age 15 and 13 quizzed in a police station alone and without support can easily become victims "first of fear, then of panic." Recognized juvenile authorities are in accord that parents or guardians should be present when

juveniles are being questioned concerning their participation in acts of delinquency[.]

[*Id.* at 240, 225 *A.2d* 110 (citation omitted).]

The Court suppressed the confessions on this analysis:

> Upon a consideration of the totality of the circumstances under which the appellants' confessions were obtained, we cannot say it convincingly appears that the confessions were voluntarily made. In light of the combination of (1) the inconsistencies among the several statements of appellants in themselves and the inconsistencies between each statement and the uncontroverted ... evidence, (2) the age of the appellants, (3) the protracted periods of persistent questioning which preceded the confessions, (4) the oppressive environment of the police station where the questioning was conducted, and *particularly* (5) the repeated refusal by the police to let the parents see their sons we cannot find that the State has met its burden of proving that the oral and written confessions of each appellant were obtained by methods consistent with due process and which vouch for their trustworthiness.

[*Id.* at 242–43, 225 *A.2d* 110 (emphasis added).]

The Court repeatedly emphasized the importance of parental presence, going so far as to say, "The refusal by the police in the present case to permit the parents access to their sons during the interrogations *might well be sufficient in itself* to show that the confessions were involuntary even though, as the police testified, the boys did not wish to see their parents." *Id.* at 241, 225 *A.2d* 110 (emphasis added).

The Court returned to the problems raised by juvenile confessions six years later in *State in Interest of S.H.*, 61 *N.J.* 108, 293 *A.2d* 181 (1972). The case involved a ten-year-old boy who drowned a six-year-old boy by pushing him into a canal. The police began their questioning of S.H. because he was one of the last persons seen in the company of the victim whom the police were looking for on a missing persons complaint. Based on misinformation supplied by S.H. and the discovery of the victim's body, the police decided that S.H. was a prime suspect and brought him in for further questioning.

S.H.'s father was already at the police station. The police told the father that "he was not needed at that time and he left the station and went home." *Id.* at 112, 293 *A.2d* 181. A detective took the boy to a room usually used to interrogate adults, read

him his *Miranda* rights, spent about ten minutes explaining what they meant, and then questioned him and obtained a confession. The entire interrogation lasted about ninety minutes. *Id.* at 113, 293 *A.*2d 181. The father was then brought to the police station and the boy was asked to confess again, which he did in his father's presence.

The Court found the confessions to be involuntary despite the giving of the *Miranda* warning and suppressed them, declaring that "[t]he circumstances under which the station house interrogation was conducted showed a complete disregard for the well-being of the accused juvenile." *Id.* at 114, 293 *A.*2d 181.

The Court stressed again the importance of questioning a child with a parent present:

More significant is the action of the police in sending the father away from the police station before questioning the boy. *We emphasize whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian.*

[*Id.* at 114–15, 293 *A.*2d 181 (citations omitted) (emphasis added).]

Although the Court reiterated that questioning in the absence of a parent who was available "without more may be sufficient to show that the confession was involuntary[,]" it declined to pursue the point because consideration of the totality of the circumstances required suppression. *Id.* at 115, 293 *A.*2d 181. The Court found the confession to be involuntary on the following analysis:

In view of the appellant's age, the oppressive environment of the police station where the questioning was conducted, the lengthy period of interrogation ... and the cavalier treatment of the father in sending him home when his boy most needed him, we cannot say the State has met its burden of proving the confession of appellant was obtained by methods consistent with due process.

[*Id.* at 116, 293 *A.*2d 181.]

In *State in Interest of A.B.M.*, 125 *N.J.Super.* 162, 309 *A.*2d 619 (App.Div.), *aff'd o.b.*, 63 *N.J.* 531, 309 *A.*2d 617 (1973), the court sustained the admission of a confession by a twelve-year-old boy taken in the absence of a parent because the record revealed that the child had received *Miranda* warnings, that "there was a bona fide effort by the police to locate defendant's mother, that when she could not be reached the questioning continued with defen-

dant's consent, and that it was conducted with the utmost fairness...." *Id.* at 168, 309 *A.*2d 619.

In *State in Interest of J.F.*, 286 *N.J.Super.* 89, 668 *A.*2d 426 (App.Div.1995), the court observed that "[t]he police may interrogate a juvenile without the parents or guardians present only if the juvenile has withheld their names and addresses, a good faith effort to locate them is unsuccessful, or they simply refuse to attend the interrogation." *Id.* at 98, 668 *A.*2d 426 (citations omitted).

The applicability of *Miranda* to the interrogation of juveniles has been conceded by the State in this case. Although the United States Supreme Court has not yet reached that conclusion, *see Fare v. Michael C.*, 442 *U.S.* 707, 717, n. 4, 99 *S.Ct.* 2560, 2567 n. 4, 61 *L.Ed.*2d 197, 207 n. 4 (1979), this court did in *State in Interest of J.P.B.*, 143 *N.J.Super.* 96, 362 *A.*2d 1183 (App.Div.1976). Justice (then judge) Handler authored the opinion, which squarely held that *Miranda* applies to custodial interrogation of juveniles. *Id.* at 105–06, 362 *A.*2d 1183. If the child is in custody and the *Miranda* warnings are not provided, the confession is inadmissible. *Ibid.* That view was reiterated in *State in Interest of J.F.*, *supra.* The court said, "Where the police ... seek to interrogate a juvenile, they must comply with the guidelines established in *Miranda* .... " 286 *N.J.Super.* at 96, 668 *A.*2d 426 (citations omitted). Several other State courts have adopted that view. *See, e.g., State v. Loyd,* 297 *Minn.* 442, 212 *N.W.*2d 671, 674 (1973); *State v. Benoit,* 126 *N.H.* 6, 490 *A.*2d 295, 304 (1985); *Michelet P. v. Gold,* 70 *A.D.*2d 68, 419 *N.Y.S.*2d 704, 708 (1979); *A.L.T. v. State,* 614 *P.*2d 74, 77 (Okla.Crim.App.1980). Legislatures have also provided that *Miranda* be applicable to juvenile proceedings. *See, e.g.,* Rule 11, Ala.R.Juv.P. of the Code of Alabama (1999); Colo.Rev.Stat. § 19–2–511 (1999); N.Y.Fam.Ct.Act § 305.2(7) (McKinney 1999).

Of course, *Miranda* only applies to custodial interrogation by law enforcement officials. *State v. P.Z.*, 152 *N.J.* 86, 102, 703 *A.*2d 901 (1997). Custody for these purposes does not necessi-

tate a formal arrest or physical restraint. *Id.* at 103, 703 *A.*2d 901. "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." *Ibid.* (citations omitted). We have described this standard as meaning "that custody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely." *State v. Coburn,* 221 *N.J.Super.* 586, 596, 535 *A.*2d 531 (App.Div.1987), *certif. denied,* 110 *N.J.* 300, 540 *A.*2d 1281 (1988) (citations omitted).

Turning to the circumstances surrounding the questioning of O.F., in light of the principles discussed above, we find unavoidable the conclusions that his first statement during the initial interview with Cales and Sacco was involuntary under the totality of the circumstances test and that it was taken in violation of *Miranda.*

■ For these purposes, we will accept the doubtful proposition that O.F. was not a suspect at the beginning of the interview. But within a few minutes, after he denied knowledge of the fire, he was told that he was lying and that the police had contrary information. The ensuing interrogation, as described by Cales himself, was obviously intense, including as it did frequent assertions that O.F. was holding back information. He was in an isolated room in a prosecutor's office being questioned by two officers. His mother had permitted the police to take him into the room and she was locked outside in the lobby. To suggest that a reasonable thirteen-year-old boy would believe that under these circumstances he could freely leave is untenable. He was in custody, and by Cales's own admission the oral confession was obtained without advice of the rights afforded by *Miranda.*

■ The oral confession should have been suppressed under the totality of the circumstances test. In view of O.F.'s age, the oppressive environment, the extended period of intense question-

ing, the exclusion of the boy's mother, the failure to first explain the rights afforded by *Miranda* to both the mother and the boy, the subsequent failure to stop for that purpose shortly after the boy had begun to implicate himself, we cannot say that the State proved the confession was obtained by methods consistent with due process.

■ We emphatically reject the State's contention that the exclusion of the mother from the interview was permissible because she had given her consent. As noted, the only evidence that she consented came from Cale, whose testimony was suspect in many respects because of its inconsistency with the evidence given by other police witnesses. The consent to interview form which G.K. signed said nothing about her being excluded from the interview. Moreover, the judge did not find as a fact that G.K.'s testimony that she asked to be present and was rebuffed by Cales was untrue. However, for purposes of this opinion, we will assume that implicit in the judge's findings is a determination that G.K. acceded to Cales's request to interview the child outside her presence. In our judgment, that request should never have been made. Indeed, as a consequence of the Supreme Court's decisions in *State in Interest of Carlo* and *State in Interest of S.H.*, the officer's duty is to persuade the parent or guardian to attend the interview.

■ Starting with *State in Interest of Carlo, supra*, the courts of this state have repeatedly insisted that whenever possible juveniles are to be interrogated in the presence of their parents or guardian. The only exceptions to that rule are when the "the juvenile has withheld their names and addresses, a good faith effort to locate them is unsuccessful, or they simply refuse to attend the interrogation." *State in Interest of J.F., supra*, 286 *N.J.Super.* at 98, 668 *A.*2d 426. Furthermore, even a juvenile's expressed desire to avoid his or her parents' presence during a custodial interview does not justify their exclusion from the process. *State in Interest of Carlo, supra*, 48 *N.J.* at 241, 225 *A.*2d

118

110. None of the circumstances warranting interrogation in the absence of a parent were present here.

The first confession also should have been suppressed under *Miranda* since O.F. was clearly in custody and was admittedly not given his *Miranda* rights. The second confession, which was transcribed, should have been suppressed, too, since it was "merely a reprise" of what O.F. had admitted during the illegal interrogation. *State in Interest of S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181; *State in Interest of J.P.B., supra,* 143 *N.J.Super.* at 111, 362 *A.*2d 1183.

O.F.'s adjudications for the second set of offenses, other than simple assault, were based in significant part on the illegally obtained confessions which established O.F.'s responsibility for the fire. The incident giving rise to those charges occurred in O.F.'s school on the day after the fire. O.F., M.C., and D.A. were in a social studies class with J.K. Based on the testimony of J.K., the judge found that D.A. had passed him a note indicating that O.F., M.C., and D.A. were responsible for the fire. There was no direct proof that O.F. saw the note or that he was told of it. The judge found that after class, "O.F. grabbed J.K. by the throat, without justification or explanation, and threatened him, 'You better not say anything!'" He also found that O.F. continued to tighten his grip on J.K.'s throat until J.K. said, "Don't worry." The judge noted that O.F. and J.K. had been involved in unrelated physical encounters on four or five prior occasions.

In finding O.F. delinquent for fourth-degree hindering apprehension, the judge expressly relied on his "previous findings concerning the facts in this case," which we take to be a reference to the confessions, since he had adjudicated the arson offenses first. Although he did not make that express statement with respect to the second-degree tampering charge, it is apparent that that adjudication also relied on the illegal confessions. Without evidence that O.F. had committed the arson, the circumstances described above could not support the inference that he had done

anything other than attack a schoolmate for no reason, or for some unknown reason.

The adjudication for simple assault is affirmed and remanded for resentencing. The other adjudications are reversed and remanded for trial.