*State v. Rodriguez,* 172 *N.J.* 117, 132, 796 *A.*2d 857 (2002). In any case, that approach encourages full and prompt cooperation with the letter and spirit of domestic violence TROs, notwithstanding that a defendant must have an appropriate opportunity to challenge the use of such evidence in a later criminal prosecution unrelated to the domestic abuse charges.

## IV.

843 A.2d 1140

STATE OF NEW JERSEY, IN THE INTEREST
OF Q.N., A JUVENILE.

Argued January 6, 2004—Decided March 31, 2004.

166

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause for appellant, State of New Jersey (*Peter C. Harvey*, Attorney General of New Jersey, attorney).

*P. Jeffrey Wintner*, Deputy Public Defender, argued the cause for respondent, Q.N. (*Yvonne Smith Segars*, Public Defender, attorney).

Justice VERNIERO delivered the opinion of the Court.

This case implicates the rules governing juvenile confessions set forth in *State v. Presha*, 163 *N.J.* 304, 748 *A.*2d 1108 (2000). The courts below concluded that the police had violated those rules when interviewing the juvenile in this case, requiring suppression of his statements. We disagree and reverse.

## I.

We derive our summary of facts from proofs presented at the suppression hearing conducted by the trial court. On January 17, 2002, a detective from a municipal police department in Gloucester County contacted R.N., the mother of Q.N. The police suspected Q.N., a juvenile who was then age twelve, of sexually assaulting three young girls. The detective informed R.N. of the nature of

the allegations against her son and arranged to interview Q.N. at the police department the next day.

As scheduled, R.N. brought her son to the municipal building at about 2:00 p.m. on January 18, 2002. The detective escorted them to an interview room (Room One) that shared a common wall with another room (Room Two). The common wall contained a one-way, mirrored window that allowed a person located in Room Two to look through the glass and monitor events in Room One without a suspect in that room knowing that he or she was being observed. Room One is the room that the police commonly used for taped interviews.

The detective cautioned R.N. to "please pay attention" in the event that she wanted to invoke her son's constitutional rights. The detective then read a six-sentence warning from a preprinted form as required by *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Following his standard practice, the detective paused after each sentence, asking Q.N. and R.N. if they understood the right that he had just read to them, and having each of them place his or her initials next to that sentence. After the detective completed reading all six lines, both the juvenile and his mother signed the form.

After administration of *Miranda* warnings, the detective began to interview Q.N. Although Q.N. would answer certain questions, such as where he lived or whether he knew the young girls involved, he would hesitate or begin to cry whenever the detective broached the precise subject of the alleged sexual assaults. According to the detective, Q.N.'s mother responded to her son's crying by stating to him in the officer's presence, "I know you did this. Please answer the officer's questions." Despite that admonition, Q.N. continued to look at his mother and cry whenever a question involved sex. The juvenile's mother again said to him, "I can tell by the way you're acting that you did this, answer the officer's questions."

The detective asked Q.N. if he was embarrassed to talk about the subject of the investigation with his mother present. The

juvenile answered "yes." The detective then "asked [Q.N.] if he was willing to discuss this with [him] if his mother wasn't present. He responded yes." The officer inquired of R.N. whether she would be willing to let her son speak with him privately and she responded, "Yes, I'll go have a smoke." At that juncture, according to the officer's testimony, the duration of the interrogation had been "less than five minutes."

The detective indicated to R.N. that she could not leave to smoke but rather had to remain in the adjoining room so that she could monitor the interview through the one-way window. He explained to her that she would be able to "hear the interview and if she had any questions whatsoever or wanted to stop the interview all she had to do was tap on the glass." The detective positioned R.N. close to the glass and informed her that, to ensure that she could hear, he would speak slightly louder than normal and repeat any of Q.N.'s responses that were soft spoken. Q.N. was not shown Room Two, did not know that his mother would be monitoring the questions about to be continued in Room One, and was not told that his mother would be available to him after she left his immediate area.

Having positioned R.N. behind the one-way window in Room Two, the detective returned to Room One. As soon as he entered, the detective stated to Q.N. that he wanted to talk to him about one of the alleged victims. According to the officer, Q.N. responded, "I did it." After being asked by the detective to explain that response, Q.N. admitted that he had touched one of the victims a total of three times. Specifically, Q.N. acknowledged that he digitally had penetrated "her private areas" on two occasions, and that on "a third occasion he had placed his groin area against her groin area over clothing[.]" Q.N. also admitted that he digitally had penetrated two other girls and had kissed all three girls.

In questioning whether Q.N. had engaged in improper touching of the alleged victims, the officer used terms that he considered appropriate for Q.N.'s age group. For instance, the detective was asked at the suppression hearing, "what types of terms were you

using when you were talking about the sexual assaults?" As alluded to above, the officer responded, "Generally with that age I'll refer to them as the private areas, areas that would be covered by a swim suit, those types of things." As to the overall tone of the interrogation, the detective indicated that at no time did he scream or yell at Q.N. or otherwise alter his demeanor after R.N. had left the room.

While in Room Two, R.N. did not knock on the window or try to interrupt the detective's questioning. The detective informed Q.N. that he was going to bring back his mother. Thereafter, the detective went into Room Two and spoke privately with R.N., finding her in the same position near the window as when he positioned her there. R.N. stated to the detective that she had heard the conversation that had taken place in Room One. The detective then brought R.N. back into that room, intending to "go over the interview again[.]"

The detective took a short break during which he set up and turned on a tape recorder. Thereafter, the officer repeated *Miranda* warnings to both R.N. and Q.N., which they again waived, and Q.N. provided a taped statement. Although it is not entirely clear whether R.N. was present with her son in Room One for his taped interview, that fact readily is inferable from the detective's testimony. The officer recounted that, in respect of the recorded aspects of the interrogation, Q.N. "knew up-front that I was going to discuss this matter again with him in his mother's presence."

On February 5, 2002, the detective signed a complaint against Q.N. alleging acts that, if committed by an adult, would constitute sexual assault in violation of *N.J.S.A.* 2C:14–2b. Q.N. filed a motion before the trial court to suppress his confession. The detective testified to the facts described above, and the trial court explicitly found that testimony to be credible. R.N. waived her right and Q.N.'s right to appear at the suppression hearing. Thus, the proofs considered by the trial court consisted of the

officer's testimony, a diagram of the interrogation area (Rooms One and Two), and the signed *Miranda* card.

Citing *Presha*, the trial court granted Q.N.'s motion as a matter of law. The court determined that, because Q.N. was under the age of fourteen at the time of the interrogation, his confession could not be admitted unless his mother had been present in Room One during all phases of questioning. In view of the parent's absence during the interview's unrecorded portion, the trial court suppressed all statements. After granting the State's motion for leave to appeal, the Appellate Division affirmed in an unreported decision. We granted the State's motion for leave to appeal. 177 *N.J.* 487, 828 *A.2d* 915 (2003).

## II.

The parties agree, as do we, that the standards governing this dispute are found in *Presha, supra,* 163 *N.J.* 304, 748 *A.2d* 1108. In that case, we stated as a general rule "that courts should consider the totality of circumstances when reviewing the admissibility of confessions by juveniles in custody." *Id.* at 308, 748 *A.2d* 1108. We explained that

> the root of the inquiry is whether [the juvenile's] will has been overborne by police conduct. In determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the ... interrogation, including such factors as the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.
>
> [*Id.* at 313, 748 *A.2d* 1108 (internal quotation marks and citation omitted).]

■ We depart from the totality-of-circumstances approach "when a juvenile is under the age of fourteen." *Id.* at 308, 748 *A.2d* 1108. "[W]hen a parent or legal guardian is absent from an interrogation involving a juvenile that young, any confession resulting from the interrogation should be deemed inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable." *Id.* at 315, 748 *A.2d* 1108. As we have observed, "[a] young juvenile's immaturity so limits his ability to make a

knowing and intelligent waiver of rights that an added layer of protection is required." *State v. A.G.D.*, 178 *N.J.* 56, 67–68, 835 *A.*2d 291 (2003).

We also have emphasized that "when an adult is unavailable or declines to accompany the juvenile, the police must conduct the interrogation with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness." *Presha, supra,* 163 *N.J.* at 317, 748 *A.*2d 1108 (internal quotation marks and citation omitted). Irrespective of a juvenile's age, in evaluating the absence of a parent or legal guardian during police questioning, "courts should give that factor added weight when balancing it against all other factors." *Id.* at 315, 748 *A.*2d 1108.

### III.

Because Q.N. was under the age of fourteen at the time of the interrogation, we first must determine whether the police violated the bright-line rule concerning the absence of the juvenile's parent or legal guardian. As noted, *Presha, supra,* instructs that the parent's or guardian's absence will render the young offender's statement "inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable." 163 *N.J.* at 315, 748 *A.*2d 1108. We reject the State's contention that Q.N.'s mother was "present" during the unrecorded interrogation because of her location in Room Two. Unless an exception is satisfied, the standards articulated in *Presha* require the adult to be located physically within the same room or immediate area in which the police are conducting the interrogation. It is only in that fashion that the adult can serve "as advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station." *Id.* at 314, 748 *A.*2d 1108.

The fact that R.N. was absent when her son first incriminated himself does not, however, end the analysis. As indicated in *Presha's* formulation of these rules, there are exceptions to the bright-line requirement that serve to balance society's need for

effective law enforcement against a juvenile's right to constitutional protections. One exception, namely, that an adult is "truly unavailable," clearly does not apply in this case. R.N. was available to be present in the interrogation area and, indeed, was in an adjoining room only a few feet away.

■ The other exception concerns the unwillingness of the adult to attend the interrogation itself. We appreciate the distinction between a parent who is unwilling to accompany a child to the police station and a parent who is at the stationhouse but willing to be excluded from the interrogation room. The result of either scenario, however, is the same: through his or her voluntary actions, the parent or legal guardian is not present for the juvenile's confession. Given that practical reality and the balancing of interests inherent in our analysis, we conclude that R.N.'s voluntary absence from the unrecorded interrogation falls within the reasonable contemplation of what we intended as an exception to *Presha's* bright-line requirement.

■ Although we evaluate the voluntariness of the confession from the juvenile's perspective, whether a parent or legal guardian is willing to be present for that confession obviously must be considered from the adult's perspective. Due to the detective's careful explanations, R.N. knew of her right to be present with her son and knew that, if she left Room One as she eventually did, she could return at any time or could end the interview. When asked whether she wanted to absent herself knowing of those conditions, R.N. said yes, apparently without hesitation. Thus, we are persuaded that the State has demonstrated the parent's willingness not to be present during the interrogation, consistent with *Presha's* strictures.

We acknowledge that the detective did not wait for R.N. herself to suggest that she depart the interview room, something the police in future situations ordinarily should do to remove all doubt about an adult's willingness to be present for a juvenile interrogation. That said, there is nothing in the record before us to suggest that R.N.'s absence was anything but knowing and volun-

tary. Our conclusion is supported by the fact that R.N. left Room One only after the detective meticulously had administered *Miranda* warnings and after actual questioning had begun. Those circumstances properly allowed the parent an opportunity to assess the tenor of the police interview and the atmosphere within the interrogation room before agreeing to exit the room.

■ Having concluded that the State has satisfied an exception to the bright-line rule, the remaining inquiry is whether it has demonstrated "beyond a reasonable doubt that the [juvenile's] waiver [of the privilege against self-incrimination] was knowing, intelligent, and voluntary in light of all the circumstances." *Id.* at 313, 748 *A.*2d 1108. Because it concluded that the bright-line rule had been breached, the trial court engaged in no further analysis. It did, however, accept the detective's testimony as credible, leaving us with a record of essentially undisputed facts. On that basis, we elect to decide the admissibility question ourselves without remanding the matter to the trial court for that purpose.

In so doing, we note the following factors supporting the State's contention that the juvenile's will was not overborne. The questioning took place in the middle of the afternoon as opposed to an odd hour during the morning or at night. The officer used age-appropriate terms like "private areas" to avoid confusion on the juvenile's part; in other words, there is no suggestion that Q.N. did not understand the sexual nature of the questions being posed to him. Additionally, one officer, as opposed to several officers, interacted with Q.N., lessening the impact of a police-dominated atmosphere. A related fact is that, other than speaking at a slightly elevated volume to assure that R.N. could hear the questions from her position in Room Two, the officer did not raise his voice or alter his demeanor during any part of the interview.

Moreover, the entire unrecorded portion of the interrogation appears to have been brief. The early questioning conducted while R.N. was present lasted less than five minutes, according to the detective's uncontroverted testimony. Shortly thereafter, the questioning resumed and Q.N. confessed. Hence, there is no

indication that the detective subjected Q.N. to a lengthy interrogation or treated him unfairly as measured under existing standards. See *id.* at 317, 748 *A.2d* 1108 (describing conduct that is required by police whenever questioning of juvenile occurs in absence of parent or legal guardian). Similarly, it does not appear that Q.N. was suffering from exhaustion or fatigue during any portion of the questioning.

Another factor supporting admissibility is that R.N. was present during the critical stage when *Miranda* warnings were issued. To be sure, a parent's presence at that juncture is not the same as being present when the police obtain incriminating statements. In other words, *Presha's* bright-line rule would have been violated had R.N. signed the *Miranda* card and then been excluded from Room One against her wishes. A parent's presence during the *Miranda* portion of an interview is relevant, however, when considering the totality of circumstances in cases in which the bright-line rule does not require suppression as a matter of law. See *id.* at 323, 748 *A.2d* 1108 (Stein, J., concurring) (explaining that confession in *Presha* was admissible despite parent's absence in part because "juvenile defendant had the benefit of a parent's presence during the critical period before questioning began and while defendant was read his *Miranda* rights").

Not only was Q.N.'s mother present when the *Miranda* warnings were issued, she took an active role in directing her son to "answer the officer's questions." There is no doubt from this record that at the outset of the interview R.N. was in "a position to assist [Q.N.] in understanding [his] rights, [and in] acting intelligently in waiving those rights[.]" *Id.* at 315, 748 *A.2d* 1108. Therefore, in balancing all of the above factors against the age of Q.N., and giving special weight to the parent's eventual absence from the interrogation, we are satisfied that the State has carried its burden of demonstrating that Q.N.'s statements were the product of free will, which remains the central inquiry.

Our holding is not altered by the fact that the detective failed to inform Q.N. that his mother was in an adjoining room and

available to meet with him at his request once questioning had resumed. Although we trust that in the future the police will so inform juveniles in similar situations, our sense from the record is that that information, had it been furnished to Q.N., would not have affected the course of the interrogation. The juvenile confessed shortly after his mother had left his immediate area, consistent with the notion that he would speak more freely outside her presence. In light of that circumstance, coupled with R.N.'s willingness to excuse herself, we are persuaded that the detective's omissions do not defeat the voluntariness of Q.N.'s statements.

█ Stated differently, we do not believe that the detective's omissions require suppression of Q.N.'s statements. As we already have indicated, it behooves the police in the typical case to refrain from suggesting that the parent or legal guardian depart the interrogation area. Further, as just noted, when the decision to exit the area originates from the adult, the police should inform the juvenile of the adult's continued availability. When the police act in that fashion it buttresses the government's proofs and enhances the Court's confidence that the State has carried its burden of demonstrating a statement's admissibility within the totality-of-circumstances framework.

█ This strikes us, however, as an atypical case in view of the fact that Q.N.'s mother twice urged her son to confess to the suspected acts, which ultimately he did. "[A] suspect is always free to waive the privilege [against self-incrimination] and confess to committing crimes, [so long as] that waiver [is not] the product of police coercion." *Id.* at 313, 748 *A.*2d 1108. From that perspective, R.N.'s urgings were consistent with her right as a parent to so advise her son. The fact that she was able to exercise that right at the outset of the interrogation, in addition to the other above-described factors, convinces us that Q.N.'s confession was not the product of police coercion.

Similarly, judging from the circumstances existing at the time of the interrogation, we are satisfied that the detective abided by

*Presha's* overarching requirement that Q.N. be treated with utmost fairness. With R.N.'s explicit approval, Q.N. chose to respond to questions of a sexual nature without his mother present. That appeared to be the preference of both the juvenile and parent. We cannot ignore that reality in evaluating the officer's conduct and voluntariness of Q.N.'s statements. Our conclusion is strengthened by the fact that the officer insisted that R.N. remain in Room Two (rather than leave the area altogether as she originally had suggested). The officer's conduct enabled R.N. to witness the entire interrogation and ensured that the parent was in a position to stop the questioning at any juncture had she thought that necessary to protect her son's interests.

On a separate issue, we observe that R.N. was present for the taped portion of the interview in which Q.N. essentially repeated his earlier confession. We briefly note as guidance that if the detective had obtained Q.N.'s unrecorded statement improperly in the first instance, then we would be required to suppress that statement in addition to the taped statement as fruit of the poisonous tree, irrespective of R.N.'s involvement. See *State v. Johnson*, 120 *N.J.* 263, 286, 576 *A.*2d 834 (1990) (outlining standards for applying fruit of poisonous tree doctrine to suppress confessions obtained by police after earlier tainted statements); *In re S.H.*, 61 *N.J.* 108, 115, 293 *A.*2d 181 (1972) (suppressing juvenile's statements obtained without parent present for either *Miranda* warnings or actual questioning despite parent's presence during subsequent interview, explaining that second confession "was nothing more than the tainted product of the coercion which produced the first confession").

### IV.

In sum, the record demonstrates that R.N. voluntarily absented herself from the unrecorded portion of the interview. That circumstance qualifies as an exception to *Presha's* bright-line rule concerning interrogations of juveniles under the age of fourteen. We trust that, with the benefit of this opinion, the police in future

situations will not suggest that the parent or legal guardian depart an interrogation area but will allow that suggestion to originate, if at all, from the accompanying adults themselves. Similarly, we assume that the police will inform the juvenile that, once gone, the adult is available to return to the interrogation area during any part of questioning at the juvenile's request.

That the police did not so act in this case does not defeat the voluntariness of Q.N.'s statements. We reach that ultimate conclusion based on the numerous factors supporting admissibility. They are: the brief duration of the interrogation; the time of day in which it took place; the fact that Q.N. showed no sign of exhaustion or fatigue; the fact that only one officer was involved, that he did not raise his voice at any stage of questioning, and that he used age-appropriate language to avoid confusing Q.N.; and the critical fact that R.N. was present for the reading of Q.N.'s *Miranda* rights and thus was in a position to assure that her son had understood and intelligently had waived those rights.

Our case law requires that we weigh the above factors against the age of the juvenile and the fact that his mother was not present during Q.N.'s actual confession. In so doing, we hold that the State has carried its burden of demonstrating beyond a reasonable doubt that Q.N.'s waiver of rights was knowing, intelligent, and voluntary under the totality of circumstances. We hasten to add that, as with any totality-of-circumstances analysis, had any one of the factors supporting admissibility been absent, the State might not have satisfied its burden in this case. Lastly, for the reasons already expressed, our disposition is consistent with the rules and protections articulated in *Presha,* all of which we expressly reaffirm today.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for vacation of its suppression order and resumption of proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—5.

*For affirmance*—Justices LONG and WALLACE—2.

JUSTICE WALLACE, dissenting.

I respectfully dissent. I would affirm the decision of the trial court as affirmed by the Appellate Division, but for different reasons.

This case requires the Court to apply and expand upon the principles espoused in *State v. Presha*, 163 *N.J.* 304, 748 *A.*2d 1108 (2000). In *Presha*, the parent was present in the interrogation room during the reading and waiver of the sixteen-year-old juvenile's *Miranda* rights. *Id.* at 309, 748 *A.*2d 1108. After that process was complete, the juvenile's mother voluntarily left the interrogation room and allowed her son to be interrogated without parental supervision. *Ibid.* Applying a heightened totality of the circumstances test, we found it highly significant that the juvenile's mother was absent from the interrogation area at the time of his statement. *Id.* at 317, 748 *A.*2d 1108. Nevertheless, we were satisfied that the juvenile's will was not overborne because the juvenile was almost seventeen, had familiarity with the criminal process, had a parent present at the outset of the questioning, wanted to be interviewed without a parent present, and was treated fairly by the police. *Id.* at 317–18, 748 *A.*2d 1108.

While not necessary to our holding, we articulated a bright-line rule for younger juveniles. We declared that when the juvenile is under the age of fourteen, the parent or guardian's absence will render the young offender's statement inadmissible as a matter of law "unless the adult was unwilling to be present or truly unavailable." *Id.* at 315, 748 *A.*2d 1108. In support of this standard for juveniles under the age of fourteen, we referred to *In re B.M.B.*, 264 *Kan.* 417, 955 *P.*2d 1302, 1312 (1998), in which the Kansas Supreme Court stated:

> We cannot ignore the immaturity and inexperience of a child under 14 years of age and the obvious disadvantage such a child has in confronting a custodial police

> interrogation. In such a case, we conclude that the totality of the circumstances is not sufficient to ensure that the child makes an intelligent and knowing waiver of his rights.

Further, we emphasized that "when an adult is unavailable or declines to accompany the juvenile, the police must conduct the interrogation with 'the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" *Presha, supra,* 163 *N.J.* at 317, 748 *A.*2d 1108 (quoting *In re S.H.,* 61 *N.J.* 108, 115, 293 *A.*2d 181 (1972)). In *In re S.H.,* we stated that "whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian." 61 *N.J.* 108, 114–15, 293 *A.*2d 181.

In discussing the role of a parent in assisting a juvenile in the unfamiliar setting of the police station, we also cited *Gallegos v. Colorado,* 370 *U.S.* 49, 82 *S.Ct.* 1209, 8 *L.Ed.*2d 325 (1962). *Presha, supra,* 163 *N.J.* at 314, 748 *A.*2d 1108. In *Gallegos* the United States Supreme Court noted that in juvenile matters courts deal with "a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Gallegos, supra,* 370 *U.S.* at 54, 82 *S.Ct.* at 1212, 8 *L.Ed.*2d at 328. That Court explained that young children would have no way of knowing the consequences of their admissions without advice as to their rights—from someone concerned with securing those rights—and without the aid of more mature judgment as to the steps they should take in the predicament in which they found themselves. *Id.* at 54, 82 *S.Ct.* at 1213, 8 *L.Ed.*2d at 328.

With that backdrop, I cannot conclude that the interrogation of the juvenile was conducted with the utmost fairness and the highest standards of due process and fundamental fairness. First, the fundamental fact that would justify an exception to the bright-line rule is absent here. Q.N.'s mother was neither unavailable nor unwilling to be present. In fact, she was present and only absented herself at the request of the detective. But even if that hurdle were overcome, the heightened totality of the circum-

stances test was not satisfied. I find it highly significant that the police officer initiated the request to speak to the juvenile without the presence of his mother. That procedure was contrary to our jurisprudence mandating that "whenever possible" a young child should be interviewed in the presence of his parent or guardian. Moreover, the presence of the parent in an adjacent room where she could watch the interview did not satisfy the "presence" requirement because the juvenile was unaware of his mother's location.

In any event, at a minimum, when a parent is present the juvenile must be given an opportunity to consult in private with the parent concerning the appropriateness of any waiver. Additionally, there should be a clear explanation, preferably in writing, to the juvenile and the parent that either one can revoke the waiver at any time. *See, e.g., N.J.S.A.* 2A:4A–39b(1) (providing that in juvenile delinquency proceedings competent juvenile "may not waive any rights except in the presence of and after consultation with counsel, and unless a parent has first been afforded a reasonable opportunity to consult with the juvenile and the juvenile's counsel regarding this decision"). That approach is consistent with other states that have adopted bright-line requirements. *See, e.g., Colo.Rev.Stat. Ann.* § 19–2–511(1) (West Supp.2003) (granting statutory exclusion for juvenile statements or confessions resulting from custodial interrogation unless parent, guardian or counsel present, and juvenile and parent advised of juvenile's constitutional rights); *Conn. Gen.Stat. Ann.* § 46b–137(a) (West 2004) (precluding admission of juvenile's confession or admission unless (1) parent present during interview, and (2) juvenile and parent advised of juvenile's right to counsel, right to remain silent, and that statements may be used against juvenile); *Ind.Code* § 31–32–5–1(2)(C) (West Supp.2003) (requiring juvenile be afforded opportunity for "meaningful consultation" with parent, guardian, or custodian as prerequisite for effective waiver of any constitutional rights); *N.C. Gen.Stat.* § 7B–2101(b) (West 2003) (prohibiting admission of custodial statement made by juvenile

under age of fourteen in absence of parent, guardian or attorney during interrogation).

Assuming arguendo, that this Court would permit a waiver of the parental presence requirement in accordance with the guidelines suggested above, I conclude that such a waiver did not occur on the facts presented. As noted, the detective initiated the waiver when he asked Q.N. if he would be willing to speak to him without the presence of his mother. When Q.N. responded "yes," Detective Williams turned to the mother and asked her if she would allow him to speak in private with her son. R.N. agreed and left immediately thereafter. Thus, the police officer neither gave the juvenile and his mother an opportunity to consult in private on the request, nor did the officer inform the juvenile and his parent that either could revoke the waiver at any time, in which event further questioning would cease until the parent or guardian was present.

The majority encourages the police in future proceedings not to suggest that the parent or legal guardian depart the interrogation area. I concur in that view and would apply it here. The Court has declared consistently that every effort should be made to have the parent present during the interrogation of the juvenile, therefore, permitting the police to initiate the waiver inquiry undermines that principle. *See In re O.F.*, 327 *N.J.Super.* 102, 117, 742 *A.*2d 971 (App.Div.1999) (noting officer should not have requested to interview twelve-year-old juvenile outside mother's presence because officer's duty is to persuade parent or guardian to attend interview). In short, applying the totality of the circumstances test, wherein the juvenile was under fourteen, the initiation of the waiver request was by the police, the lack of an opportunity for the juvenile to consult with his mother before agreeing to be interviewed outside her presence, and the fact that the juvenile and the parent were not informed that each could separately revoke the waiver at any time, I conclude the State has not met its burden of proving the statements were obtained with " 'the utmost fairness and in accordance with the highest standards of due

process and fundamental fairness.' " *Presha, supra,* 163 *N.J.* at 317, 748 *A.*2d 1108 (quoting *In re S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181).

I concur with the majority that if the detective had obtained Q.N.'s unrecorded statement improperly in the first instance then the taped statement would be suppressed as fruit of the poisonous tree. Because I conclude the unrecorded statement was improperly obtained, I would suppress the recorded statement.

I would affirm the judgments of the Appellate Division and the trial court.

Justice LONG joins in this opinion.